**In re Edward KACZMARKSI, Debtor.**

**Donna Lipira, Plaintiff,**

v.

**Edward Kaczmarski, Defendant.**

**Bankruptcy No. 98–B–39193.**
**Adversary No. 99–A–372.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 6, 2000.

Robert J. Zotti, Law Offices of Robert J. Zotti, Wheaton, IL, for Plaintiff.

Edward Kaczmarski, Burbank, IL, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to the Chapter 7 bankruptcy petition filed by Debtor/Defendant Edward Kaczmarski ("Debtor" or "Defendant") on December 7, 1998. In it, Plaintiff, Donna Lipira f/k/a Donna Kaczmarski ("Lipira") seeks to bar dischargeability of debt due her, under 11 U.S.C. §§ 523(a)(6) and 523(a)(5) and (15).

Following trial held on Lipira's Complaint to Determine Dischargeability of Debt, the Court now makes and enters Findings of Fact and Conclusions of Law. Pursuant thereto, the debt owed to Lipira by the Debtor will by separate judgment order be held nondischargeable under 11 U.S.C. § 523(a)(6) because that debt was incurred due to a willful and malicious injury by Debtor to Lipira or her property. The debt owed to Lipira will also be held nondischargeable under § 523(a)(15) because Debtor has not met his burden of establishing that he cannot afford to pay the debt or that the benefit to him outweighs the detriment to Lipira of having the debt discharged.

## FINDINGS OF FACT

On or about July 1, 1997, during dissolution proceedings between Lipira and Debtor pending in the Circuit Court of DuPage County, Illinois, the state court judge entered a temporary restraining order, on the motion of Lipira. That order enjoined Debtor from transferring, encumbering, concealing, or otherwise disposing of any property, including any funds from a home equity line of credit with the West Suburban Bank encumbering the marital home located at 1127 S. Fairview, Lombard, IL. The marital home was then encumbered by two mortgages. The second of the two mortgages secured two separate lines of credit subject to being drawn on.

On July 21, 1997, that judge modified the July 1, 1997 order, but only to permit Debtor to borrow such funds as was then necessary to pay utility bills for the marital home incurred through the month of August, 1997. Debtor was required to account for any such borrowing and to reimburse the marital estate for same.

Debtor violated that order by borrowing more funds on the marital home equity line of credit than was needed to pay utility bills. Debtor used most of those borrowed funds for his personal benefit. He later borrowed more on the line of credit, thus imposing a larger second mortgage debt on the marital home.

On March 3, 1998, in violation of another aspect of the state court orders, Debtor withdrew $29,973.19 from the Vectra Technologies, Inc. Savings and Retirement Plan which was marital property. Those withdrawn funds were used by Debtor for his own exclusive benefit.

On September 24, 1998, the state court judge entered a Judgment for Dissolution of Marriage ("Divorce Decree") in the dissolution proceedings between Debtor and Lipira. Pursuant to that Judgment, Lipira received ownership of the marital home. The Divorce Decree obligated Debtor to pay the outstanding second mortgage home equity line of indebtedness which was then in the amount of $13,630.74. The Divorce Decree also required the selling of corporate common stock owned by Debtor and Lipira and application of Debtor's half of the stock sale proceeds to that second

mortgage debt. The common stock was sold and the proceeds so applied. Debtor was required to pay the remaining balance due on the second mortgage line of credit loan from monies that he owned and could borrow from his retirement account through his then job at Duke Energy. However, after making some partial payment from his retirement account, Debtor did not fully repay the second mortgage indebtedness. The current balance on the second mortgage is $9,690.84. It was Debtor's dissipation of marital property through borrowing on the second mortgage line of credit in violation of state court orders that resulted in him being obligated under state court orders to pay off the debt balance on that line of credit, and resulted in the current balance due.

Debtor filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. on December 7, 1998, and this case followed.

During trial, Lipira testified concerning her financial status. Through the Judgment for Marriage Dissolution, Lipira was ordered to receive three years of maintenance. For the first and second year following the divorce, she was to receive maintenance at a rate of $2,179.50 per month. Of that sum, Lipira uses $179 to apply toward the $360 that she pays monthly on the first mortgage that pursuant to the Divorce Decree she is obligated to pay. However, Lipira's monthly maintenance income was reduced under the Judgment by $679 as of October 1, 1999.

Lipira is employed as a copy technician at Butler School in Oak Park, Illinois, where she has worked almost eight years. She earns approximately $18,000 during a nine month school year. Lipira is generally not employed during summer, but if a secretary is away then she tries to fill in. She has received only one raise since she became employed full time after the divorce. Prior to becoming a full-time employee, Lipira earned between $11,000 and $12,000 per annum at the Butler School. Lipira has a high school diploma and at-

tended a business college. She testified that she cannot obtain a higher salaried job because she does not have the requisite computer skills. She currently does not have the money to pay for courses needed to gain computer skills.

Lipira has a negative monthly income to the extent of $680.16, a shortfall of income needed to pay necessary expenses. That calculation includes the taxes that must be paid on her maintenance income received from Debtor. Lipira has had a shortfall in her income since the divorce. As a result, she borrows from her family to make ends meet. She has a twenty-one year old son who resides with her. He is employed and attends school but does not contribute to support of his mother. Lipira intends to continue to reside at the marital home as long as she can but the bank secured by loans on the property has threatened foreclosure.

Lipira does not have a vested retirement plan. Under the divorce decree she was given an interest in Defendant's retirement fund at Duke Energy but when he transferred jobs, he lost his interest in that fund, and so did she. No retirement fund is available at Vectra Technologies either, because Debtor/Defendant cashed in that fund and spent it all for his personal benefit. At Butler, Lipira has $2,100 in a retirement plan but the plan is not vested and will not vest for another six years.

Debtor/Defendant is currently employed at Sargent & Lundy as a Senior Project Engineer earning approximately $90,000 a year. He is eligible for overtime when available. Prior to his current employment he worked at Duke Energy earning $80,000 a year.

Debtor earns $3,801.60 twice each month. After taxes and a $76 voluntary 401(k) contribution, Debtor takes home approximately $2,444 twice a month. He has no dependants and lives alone. His car loan is his only remaining debt. Debtor can afford without financial stress to pay the outstanding balance on the second

mortgage line of credit over time. He is current on his maintenance obligation and able to meet all his other obligations.

Debtor's exhibit 6 is his monthly net income summary from January 1, 1999 through July 1, 1999. That summary indicates that he had a negative cash flow of $1,299.61 in June 1999. However, that large negative cash flow was due to a one-time cost of truck repair that cost him over $1,100. Apart from that extraordinary expense, Debtor's summary indicates a negative monthly cash flow of on average no more than $250 that month. That computation is based upon a payment of maintenance to Lipira at a rate of $2,179 per month and on the Debtor's earnings of $80,000 per year with Duke Energy. As of October 1, 1999, however, Debtor's maintenance obligation was reduced by $679 per month. In addition as a result of his new job with Sargent & Lundy, he now receives a base salary increase from $80,-000 per year at his old job to his new base salary of $90,000 per year. These base earnings do not include additional overtime income which he is eligible to earn. Therefore, he now can (if he lives at the same level) manage a surplus of income over expenses every month of about $900 monthly.

Debtor admits that he withdrew funds from the second line of credit. He also admits that he cashed in the entire interest in the Vectra retirement fund which contained about $29, 973.19. After paying taxes, Debtor received $23,978.55. Debtor claims that he simply forgot about the court orders forbidding these transactions. Debtor cannot account for all the Vectra money. He did, however, testify that he bought two horses for his female friend for about $2,500 in total. He has also paid off all his back due bills.

To justify his withdrawing of proceeds from the Vectra Technologies fund, Debtor presented a letter from Vectra dated January 5, 1998. The letter indicates that the plan was being terminated and requested that the plan participants select what to do

with their accounts. The letter did not, however, require that Debtor receive a cash distribution; rather, it gave Debtor the option of placing the funds in an annuity.

As for the funds withdrawn on the second mortgage line of credit, Debtor claims that he did not spend the funds solely on his own expenses. He testified that he used $486.02 from the line of credit to pay a utility bill in the marital home. The state court order allowed him to do so provided that he kept a record, and he did provide copies of canceled checks to substantiate that testimony. However, he did not supply records to cover all use of borrowing on the secured mortgage.

Debtor testified that he intended to borrow money from the account at Duke Energy to pay off the second mortgage debt as he had promised to do, but the Duke retirement plan did not allow more than two loans. On July 22, 1998, Debtor had one loan outstanding for $4,168.39. On October 19, 1998 Debtor took out another loan for $649.46. Therefore, he was not permitted to take out a third loan so as to pay off the indebtedness on the second mortgage home loan line of credit. Debtor claims that he was not aware of the provision preventing more than two loans when he made the second borrowing.

At the close of Lipira's case, Debtor moved for Judgment on Partial Findings under Bankruptcy Rule 7052 which incorporates Fed.R.Civ.P. 52. An order was entered denying the motion for reasons stated from the bench. The Court concluded that Lipira had presented enough evidence to establish a prima facie case and thereby require Defendant to go forward.

Debtor then called as witnesses Mike Flynn the attorney who represented Debtor in the filing of his Chapter 7 and Alan J. Franowski, Debtor's brother-in-law. Franowski testified that in June or July 1998, he was aware of Debtor's financial situation. Franowski provided Debtor with

money and food and paid out money as the security deposit for Debtor's new apartment in November 1998. Franowski also paid for Debtor's lawyer Michael Flynn by Franowski himself doing work for Flynn. Franowski acknowledged, however, that since Debtor obtained his current job in August 1999 with Sargent & Lundy, Debtor has not had to ask him for money.

Lipira now requests that the underlying obligation of Debtor to pay the second home equity line of indebtedness in the sum of $9,690.84 be declared nondischargeable. She also asks that an order modifying the automatic stay be entered by this Court to permit her to enforce the judgment entered in the Circuit Court of DuPage County relative to the payment of that indebtedness and for such other relief as this Court deems necessary.

Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334 and 28 U.S.C. § 157. This matter has been referred here by Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue is proper under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## CONCLUSIONS OF LAW

### Count I—Nondischargeability Under § 523(a)(6)

Section 11 U.S.C. § 523(a)(6) states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

■ The Supreme Court has addressed the proper interpretation of the term "willful" under the discharge excep-

tion in § 523(a)(6) in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). That opinion held that the word "willful" modifies the word "injury" and therefore a deliberate or intentional injury is required for nondischargeability and not simply a deliberate or intentional act that leads to injury. *Id.*, 523 U.S. 57, 118 S.Ct. at 977, 140 L.Ed.2d 90. As such, § 523(a)(6) does not encompass recklessly or negligently inflicted injuries. *Id.*

The Court did not define the scope of the term "intent" as used by the Court to describe willful conduct. However, recent opinions have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required in *Kawaauhau*. See *In re Markowitz*, 190 F.3d 455 (6th Cir.1999); *In re Budig*, 240 B.R. 397 (D.Kan.1999); *In re Kidd*, 219 B.R. 278 (Bankr.D.Mont.1998).

■ Debtor withdrew all the funds from the Vectra retirement fund and borrowed funds on the second line of credit in violation of state court orders. The motion for a temporary restraining order was earlier filed by Lipira to prevent that very behavior by Debtor and to protect her marital assets, and the state judge entered an order to forbid such behavior. Nonetheless Debtor proceeded to dissipate those assets. By violating the restraining order that his wife had obtained for the purpose of preventing his dissipation of marital assets, Debtor was aware that his actions were substantially certain to lead to injury of Lipira or her property interest. Debtor's actions were thus willful.

■ The term "malicious" under § 523(a)(6) means in conscious disregard for one's duty or without just cause or excuse. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). Ill will or specific intent to do harm is not required. *Id.* Debtor withdrew the funds from the Vectra retirement

account after a court order forbad him from doing so, and he borrowed funds on the second home equity line of credit after the same court forbad him doing so. He used the money for his exclusive personal benefit and cannot account for all the money thereby received. He did spend a portion on doctor's and lawyer's bills. He also spent a portion of the money borrowed by encumbering the home that his ex-wife had an interest in on horses for his female friend. He claims that he simply forgot about the court order. His actions were malicious because they were without just cause or excuse and contrary to his clear legal duty as found by state court orders. A convenient memory about state court orders in a divorce proceeding is not an excuse to violate those orders.

The $9,690.84 debt owed to Lipira was therefore incurred by a willful and malicious injury to Lipira and Lipira's property interest.

### Count II—Nondischargeability under §§ 523(a)(5) and (a)(15)

In pertinent part, § 523(a)(5) and (a)(15) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a government unit, or property settlement. . . .

* * *

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. §§ 523(a)(5) and (a)(15).

■■■■ Exceptions from discharge under § 523, are generally construed strictly against the objecting creditor and liberally in favor of the debtor in order to further the policy of providing the debtor with a fresh start. *In re Reines,* 142 F.3d 970, 972–73 (7th Cir.1998). Consequently, the party alleging that a debt is nondischargeable bears the burden of proving the nondischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "The policy of protecting and favoring the debtor is tempered, however, when the debt arises from a divorce or separation agreement." *In re Crosswhite,* 148 F.3d 879, 883 (7th Cir.1998).

■■■■ Marital debt for alimony, maintenance or support of the debtor's spouse, former spouse or child is nondischargeable. § 523(a)(5). Any marital debt other than alimony, maintenance or support that is incurred in connection with a divorce or separation is also nondischargeable. § 523(a)(15). Section 523(a)(15) is intended to cover divorce-related debts such as those in property settlement agreements. *Id.,* 148 F.3d at 882.

■■■■ The former spouse bears the initial burden of proving that she holds a § 523(a)(15) claim against the debtor. *Id.* To satisfy that burden the creditor must establish that she is owed a debt other

than the type listed under § 523(a)(5) and that it was awarded in connection with a divorce decree. *Id.* Once that showing is established, the burden rest with the debtor to prove that he or she falls under either of the two exceptions to nondischargeability under subsection (A) the "ability to pay" test or subsection (B) the "detriment" test. *Id.*

 A determination of whether a debt is in the nature of alimony, maintenance or support under § 523(a)(5) is a question of federal bankruptcy law rather than state law. *Reines,* 142 F.3d at 972. Courts have considered the following factors in making that determination:

"(1) whether the obligation terminates upon the death or remarriage of either spouse (termination of the obligation indicates the obligation was for support);

(2) whether the obligation is payable in a lump sum or in installments over a period of time (obligation spread over time indicates the obligation was for support);

(3) whether the payments attempt to balance the parties' income (payments to balance income indicate the payments were for support);

(4) the characterization of the obligation in the decree (obligations described as support indicate the obligation was for support);

(5) the placement of the obligation in the decree (obligations under the heading support indicate the obligation was for support);

(6) whether there is any mention of support payments (separate mention of support payments indicates the obligation is not for support);

(7) whether there are children who need support (if children are of the age when support is required, this indicates the payments may be for support);

(8) whether there is a large differential in net income (a large differential in income would indicate the payments were for support); and

(9) whether the obligation was thought to be taxable to the recipient (payments thought to be taxable indicate the payments were for support)."

*In re Paneras,* 195 B.R. 395, 401 (Bankr. N.D.Ill.1996). The underlying question in this determination is whether the divorce court and parties intended to provide support or to divide marital property and debts. *Id.* "The effect and the function of the obligation is also an important criterion." *Id.*

 The foregoing nine factors have been considered. Here, all but one, number eight, applies in favor of a determination that the debt owed on the second line of credit was intended not in the nature of alimony but was rather part of a property settlement and disposition. There is no mention in the Divorce Decree that Debtor's obligations with respect to the subject debt was to terminate upon Lipira's' death or remarriage. The debt was to have been paid off within thirty days of entry of the Divorce Decree. The allocation of that debt was not to balance the parties' respective incomes but rather was in disposition of questions arising out of dissipation of marital assets by Debtor. The debt in issue was characterized and placed in Article III of the Divorce Decree titled Property Division and not in Article II titled Maintenance. The parties had no children from their marriage. The debt was not referenced as being taxable to Lipira. There is, however, a disparity in the parties' income with Debtor earning more income than Lipira.

Since all the applicable test factors except one support a determination that the debt involved here is not in the nature of support under § 523(a)(5), the disparity of income factor, standing alone, does not alter the character of the debt. *Id.* The intent of the parties and state court was to divide the marital property taking into consideration the dissipation of marital assets by Debtor. Thus, the obligation of Debtor to pay the second home equity line

of indebtedness was and is not in the nature of support, alimony or maintenance under § 523(a)(5).

Accordingly, this case falls within the purview of § 523(a)(15), and it became Debtor's burden to prove either that he does not have the ability to pay the debt or that the benefit to him of a discharge of the debt outweighs the detriment to Lipira if the debt is discharged.

Debtor cannot meet his burden under the "ability to pay" test because he can pay the debt over time, clearly having adequate income to do so. However, he seeks to prevent the nondischargeability on grounds that the benefit to him is greater than the detriment to Lipira of having the debt discharged. As seen below, he cannot meet that burden.

■■■ A "totality of the circumstances" test is the general method used for weighing benefit and detriment under § 523(a)(15)(B). *Crosswhite*, 148 F.3d at 888. Bankruptcy Courts have included various factors in the totality of the circumstances test: (1) the income and expenses of the parties; (2) the nature of the debt; (3) the former spouse's ability to pay; and (4) the number of dependents. *In re Rossi*, 1999 WL 253124, at *6 (Bankr.N.D.Ill.1999). Applying those factors here, the totality of the circumstances favors the debt being found not dischargeable.

There is a great disparity in the income of the parties. Lipira earns only $18,000 a year as a copy technician while Debtor earns $90,000 a year as an engineer, plus possible overtime. Debtor now earns $10,000 more than he earned at his previous job. Unlike Debtor, Lipira cannot obtain a better paying job because she cannot afford to take the computer courses that would make that possible. Lipira has a twenty-one year old son who is in school and resides with her, but has no funds to contribute to her support or to household expenses that the son benefits from.

Debtor, on the other hand, has no dependents and lives alone.

Debtor is far better off financially than his ex-wife. Lipira has credibly testified that she barely makes ends meet now and has to borrow money from her family in order to survive.

Lipira is burdened with a negative monthly cash flow of $680. Moreover, as of October 1, 1999 her monthly income was reduced even further due to a $679 decrease per month in her maintenance payments. Lipira clearly cannot afford to pay the balance on the second line of credit if Debtor's obligation in that regard is discharged. She faces the threat of foreclosure action against her home.

In contrast, Debtor's brother-in-law has testified that since Debtor began his new job at Sargent & Lundy in August of 1999, he has not had to borrow any money, and Debtor's income shows why that is so. Debtor's income and expense statement introduced in evidence indicated a negative monthly income. However, apart from one extraordinary expense, that negative balance was about $250. Moreover, that computation did not reflect the $679 per month reduction in Debtor's monthly maintenance obligation nor did it reflect the $10,000 annual increase that Debtor has since received at his current job. Debtor does not have any other debt with the exception of a car loan which he can afford to service monthly. The minimum amount due to pay interest on the second line of credit is $70. Considering all of Debtor's financial circumstances, and his present positive cash flow, he can easily afford to pay off the second home line of credit in monthly installments.

■■ Discharging the debt owed to his ex-wife would simply provide Debtor with more disposable income. "This is not the type of benefit that § 523(a)(15)(B) sought to protect." *In re Florio*, 187 B.R. 654, 658 (Bankr.W.D.Mo.1995).

In weighing the totality of the circumstances, it must be concluded that the ben-

efit to Debtor does not outweigh the heavy detriment to Lipira should the debt due to her be discharged.

### CONCLUSION

For reasons stated, judgment will separately enter providing that the debt owed to Lipira by Debtor is nondischargeable under both §§ 523(a)(6) and 523(a)(15).