**In re Richard C. RUSSELL, Karen M. Russell, Debtors.**

**ABF, Inc., Plaintiff,**

v.

**Richard C. Russell and Karen M. Russell, Defendants.**

**Bankruptcy No. 99–40101.**
**Adversary No. 99–4013.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

March 30, 2001.

---

Jay Kennedy, Indianapolis, IN.

David Rosenthal, Lafayette, IN.

## *DECISION*

ROBERT E. GRANT, Bankruptcy Judge.

This matter is before the court following trial of the issues raised by Plaintiff's complaint to determine the dischargeability of the debtors' obligation to it. Plaintiff contends that the debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6). Although both debtors were originally named as defendants, at trial Plaintiff voluntarily dismissed its claim against Karen Russell. Accordingly, only the claim against Richard Russell remains.

Mr. Russell operated a medium sized feeder pig operation and farmed several plots of land, growing both soybeans and corn. On April 23, 1998, the debtor executed a promissory note in favor of ABF evidencing a loan of two hundred fifty-five thousand dollars. (Pl's.Ex. 1.) To secure

this debt, he granted ABF a security interest in "[a]ll of [the debtor's] crops, growing and to be grown, and other farm products ... and all of [the debtor's] accounts, accounts receivable, equipment, vehicles, livestock and inventory, wherever located, now owned or hereafter acquired ...." (Pl's.Ex. 2.) The debtor also provided ABF with a list of grain elevators or storage facilities where he would sell or store his crops, *see* I.C. 26–1–9–307(1)(c), and agreed that he would only sell, market, or store his crops at those facilities. This list contained the name of only one such facility, Excel Co–Op in Reynolds, Indiana. (Pl's.Ex. 5.) In addition to limiting the potential buyers of debtor's crops, the security agreement also placed other restrictions upon their use; they were not to be used as feed for any livestock. (Pl's.Ex. 2.)

ABF's complaint arises out of the debtor's disposition of the crops securing its loan. The complaint is best characterized as one based upon the debtor's "conversion" of collateral, specifically the debtor's 1998 soybean and corn crops. Where the soybean crop is concerned, the debtor sold it to Cargill, an undisclosed buyer, and thus avoided having the buyer issue a joint check payable to both the debtor and ABF. *See,* I.C. 26–1–9–307(1)(d). He then used the proceeds of this sale for purposes other than repaying the Plaintiff, such as paying other creditors and funding his ordinary living and business expenses. Where the corn crop is concerned, the debtor fed it to his pigs during the later part of 1998.[1] Plaintiff claims, among other things, that these actions constitute a willful and malicious injury, rendering its claim against the debtor non-dischargeable pursuant to § 523(a)(6).

The parties have agreed that the total value of the crops in question is $129,500.

Furthermore, the debtor is entitled to various credits against the amount due so that the current balance due Plaintiff is less than the value of the crops. Consequently, the only real question before the court involves whether the debtor's obligation should be excepted from discharge.

■ ABF bears the burden of proving, by a preponderance of the evidence, that its debt should be excepted from the debtor's discharge. *See, Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Since the primary focus of ABF's complaint is that the debtor converted its collateral, the court begins its analysis with an examination of § 523(a)(6). This portion of the Bankruptcy Code excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Historically, issues concerning dischargeability as a result of a debtor's conversion of collateral have been litigated under this section. Indeed, all courts accept the proposition that "[a] debt for willful and malicious conversion is nondischargeable under [§ 523(a)(6) ]." *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985)(abrogated on other grounds by *Grogan,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). *See also, Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). The problem lies in identifying just what such a conversion may be.

The Supreme Court recently examined § 523(a)(6) in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). There the creditor argued that the debtor had "intentionally rendered inadequate medical care ... that necessarily led to her injury." *Geiger,* 523 U.S. at 61, 118 S.Ct. at 976. As framed by the Supreme

---

1. These pigs were subject to a prior lien in favor of another lender.

Court, the issue presented was: "Does 523(a)(6)'s compass cover acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury ...?" *Id.* The Court examined the language of the statute, first noting that the word willful is defined as "voluntary" or "intentional," *Geiger,* 523 U.S. at 61 n. 3, 118 S.Ct. at 977 n. 3, and then concluded that "the word 'willful' ... modifies the word 'injury,' indicating that *nondischargeability takes a deliberate or intentional injury,* not merely a deliberate or intentional act that leads to an injury." *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977(emphasis added). It then explained that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts" and "[i]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply, 'the act itself'." *Geiger,* 523 U.S. 57, 61–2, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (quoting *Restatement (Second) of Torts* § 8A, Comment a, p. 15 (1964)).

*Geiger* seems to have created almost as much consternation as it set out to resolve. In part, this is because the Court never said what "willful" is; only what it is not—it is not negligence, recklessness or a breach of contract. *Geiger,* 523 U.S. at 61–62, 118 S.Ct. at 977. Although the Court observed that the language of § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts,'" *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977, this recognition of a logical association is not the same as saying the two are one and the same. *In re Miller,* 156 F.3d 598, 604 (5th Cir.1998). Furthermore, while *Geiger* clearly requires a "deliberate or intentional injury," *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977, the Court never explained what is necessary to satisfy this requirement. *In re Baldwin,* 245 B.R. 131, 135 (9th Cir. BAP 2000).

Compounding the fact that *Geiger* did not clarify the meaning of § 523(a)(6) as precisely as one might wish, is the fact that, in some respects, it also appears to establish a largely subjective standard—requiring an actual intent to cause injury. A debtor, however, will almost always be able to come forward with innocent explanations for its actions, testifying that "I did not intend to ...." This is particularly true in cases involving the conversion of collateral because a debtor's actions with respect to a creditor's collateral are rarely motivated by a desire to injure either the creditor or its collateral. *See, In re Kidd,* 219 B.R. 278, 284 (Bankr.D.Mont.1998). Instead, the wrongful use of a creditor's collateral often represents a last ditch effort to save failing business or personal finances and is motivated by the debtor's genuine, but unrealistic, belief that a change in fortune will permit the payment of all its debts, including the debt to the secured creditor. The case law is replete with examples of this behavior. *E.g., In re Gagle,* 230 B.R. 174 (Bankr.D.Utah 1999); *In re Wikel,* 229 B.R. 6 (Bankr.N.D.Ohio 1998); *In re Powers,* 227 B.R. 73 (Bankr. E.D.Va.1998).

Trying to resolve *Geiger's* ambiguities has lead to largely unnecessary inquiries into such things as whether the debtor's actions "necessarily caused" or were "substantially certain to cause" injury and the extent to which the debtor "knew" or "believed" that this was so. *See e.g., Miller,* 156 F.3d at 604, 606(substantial certainty of harm or subjective motive to do harm); *State of Texas ex rel Board of Regents v. Walker,* 142 F.3d at 813, 823–24(5th Cir. 1998)(act necessarily caused or was substantially certain to cause harm or done with subjective motive to do harm); *In re Markowitz,* 190 F.3d 455, 464 (6th Cir.1999)(debtor desires to cause the consequences or believes they are substantial-

ly certain to result); *Baldwin,* 245 B.R. at 136(same); *In re Kaczmarski,* 245 B.R. 555, 561 (Bankr.N.D.Ill.2000)(debtor acts with the subjective intent to injure or knowledge that injury is substantially certain); *In re Sintobin,* 253 B.R. 826, 829 (Bankr.N.D.Ohio 2000)(debtor intends to cause injury or is substantially certain that injury will occur). These formulations suffer because they are at once too rigorous and, yet, may not be rigorous enough. To the extent they focus on the debtor's knowledge or belief that its actions would cause (or have a substantial certainty to cause) harm, they tend to overemphasize the debtor's subjective motivation. At the same time, however, by allowing the construction of a causal chain which links the debtor's actions to the creditor's injury, it is far too easy to slide backwards from an intentional injury or one that is substantially certain, through one that necessarily causes harm, *see, Miller,* 156 F.3d at 604; *Walker,* 142 F.3d at 823, 824, into the intentional act that causes injury which *Geiger* clearly excludes.

■ In addressing the meaning of "willful" for the purposes of § 523(a)(6), the Supreme Court did not require a subjective inquiry to determine whether a debtor intentionally injured a creditor. Although a subjective intent to harm will certainly fulfill the requirements of the statute, *Geiger* does not need to be and should not be read as requiring proof of a subjective motivation. It held only that § 523(a)(6) required an intentional injury rather than an intentional act. *Geiger,* 523 U.S. at 61, 118 S.Ct. 974 ("nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."). This standard may be satisfied with something less than a showing that the debtor's actions were motivated by a specific desire to harm the creditor or its collateral.

■ The key to applying *Geiger* without unnecessarily injecting subjectivity into the analysis is to accurately identify the creditor's true injury. It is easy to confuse the unique damage caused by the debtor's action with the creditor's true injury and it is that confusion that leads to the construction of causal chains linking action with injury. Nonetheless, the true injury is not the unique or case specific damages that are somehow monetized and then memorialized in a money judgement. Those damages are only the manifestation of the true injury. They indicate the magnitude of the creditor's injury, not whether an injury has occurred. Admittedly, the magnitude of the injury will influence whether a creditor is interested in pursuing the matter and what, if anything, it may recover should it do so. Nonetheless, the lack of damage does not necessarily mean that no injury has occurred, it means only that no real harm has come of it. Indeed, it is the recognition that there can be injury without harm that lies behind the opportunity to recover nominal damages.

■ The creditor's true injury occurs on an abstract level. It is the debtor's invasion of the creditor's legally protected right. The court should focus on this injury, as opposed to the resulting damage, when it asks whether the injury was intentional. When it does so, the answer will usually be relatively obvious because the debtor's action *is* the injury. For example, in a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor. In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that

led to the damaged reputation. Consequently, the proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks. Similarly, in the conversion of collateral scenario, the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. *See, In re LaGrone,* 230 B.R. 900, 904 (Bankr.S.D.Ga.1999). Consequently, the proper question is not whether the debtor intended that its secured creditor would go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.

■ Just because the debtor may have intentionally injured the creditor is not enough to make the resulting debt nondischargeable. Section 523(a)(6) has two components. The injury must not only be willful (intentional); it must also be malicious. This requirement is separate and distinct from the issue of willfulness. *See, Kimzey,* 761 F.2d at 424; *Markowitz,* 190 F.3d at 463; *In re Scarborough,* 171 F.3d 638, 641 (8th Cir.1999), *cert. denied,* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999). *But see, Miller,* 156 F.3d at 606 (*Geiger* established a unitary concept for willful and malicious).

■ "Malicious" means " 'in *conscious* disregard of one's duties or without just cause or excuse; it does not require ill will or a specific intent to do harm." ' *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994) (quoting *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986))(emphasis added). Consequently, a debtor's actions are not automatically labeled malicious simply because they are wrongful. *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989). There must also be a consciousness of wrongdoing. *In re Stanley,* 66 F.3d 664, 668 (4th Cir.1995). It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6). *Posta,* 866 F.2d at 367; *In re Cardillo,* 39 B.R. 548, 550 (Bankr.D.Mass.1984). Without it there can be no "conscious disregard of one's duties," *Thirtyacre,* 36 F.3d at 700, only an unconscious one. *Accord, In re Grier,* 124 B.R. 229, 233 (Bankr.W.D.Tex.1991)("Simply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of the debtor should not be enough to trigger a finding of malice."). *See also, Davis,* 293 U.S. at 328, 332, 55 S.Ct. at 153 (a willful and malicious injury does not automatically result from every tortious conversion).

■ Measuring the debtor's conduct against these standards leads to the conclusion that his disposition of ABF's collateral constituted a willful and malicious injury. *See, e.g., In re Wehri,* 212 B.R. 963 (Bankr.D.N.D.1997). Where the soybeans are concerned, the debtor's actions—selling them and then using the sale proceeds for purposes other than payment of the obligation the crop secured—were clearly intentional. Debtor intended to sell the beans, and when he used the sale proceeds to pay bills and expenses other than the obligation to ABF, he intended to do that as well. His actions were also malicious; they were in conscious disregard of his duty. Debtor was aware of his obligation not to deliver or sell his crops to anyone other than one of the facilities he had previously disclosed to the Plaintiff. Nonetheless, he did so anyway.

The debtor attempts to justify his actions with the explanation that he did not

intend to harm ABF. Instead, it was his belief that, by using the sale proceeds to pay other creditors, he could maintain his farming operation and would be able to weather what he saw as merely a temporary financial crisis. Ultimately, he believed this would allow him to fully pay all creditors, including ABF. This explanation of the debtor's subjective motivation does not change the objective reality that he intended to dispose of the creditor's collateral in a manner inconsistent with his obligation and knew this at the time he was doing so.

The result with regard to the debtor's corn crop is the same. Rather than sell this crop and dispose of its proceeds, the debtor chose to feed it to his pigs. Doing so was in violation of the security agreement, and again, debtor knew this was the case. His explanation for the misconduct is two-fold. To a large extent, however, it echos the explanation which was given for the disposition of the soybeans.

By the fall of 1998, the debtor had run out of feed for his small pigs. Furthermore, at this time the hog market was so very bad you could not even give feeder pigs away. Consequently, the debtor found himself in a situation where he had 1,500 pigs he was not able to dispose of and nothing to feed them. He believed he had but two choices; let the animals starve or feed them the corn which secured his obligation to ABF. He chose the latter option. In doing so, he hoped that by the time the animals reached a marketable weight the market would improve, allowing them to be sold profitably, and he would be in a position to pay all creditors, including ABF. Unfortunately, the debtor reached this decision without adequately consulting the lender in question—ABF. Although the debtor received instructions from National City Bank, the lender with a first lien upon the pigs, that he should keep feeding them, it does not appear that he made it clear to this lender that he did not have the resources with which to do so. More importantly, ABF was never informed that the debtor had made the decision to use its collateral to feed the pigs which had been liened to National City Bank.

The court recognizes that duress or compulsion may constitute a justification or excuse which will help prevent an intentional injury from being a malicious one. *See, e.g., In re Longley*, 235 B.R. 651 (10th Cir. BAP 1999)(debtor's delivery of his vehicle to a drug dealer in order to avoid threatened physical harm was not a willful and malicious injury to the lienholder). The court also recognizes that a course of dealing between a debtor and a creditor, in which the creditor has repeatedly consented to, acquiesced in, or tolerated a disposition of its collateral in contravention of the security agreement, may also constitute a justification or excuse. *Davis*, 293 U.S. 328, 55 S.Ct. 151. In this instance, however, the debtor has failed to satisfactorily prove either duress, compulsion or a course of dealing which ABF consented to, acquiesced in or tolerated.

Undoubtedly, the debtor found himself in a most difficult situation where his small pigs and ABF''s collateral were concerned. While this might excuse a temporary or limited misuse of ABF''s collateral, it does not excuse the debtor's conduct over the many weeks it took to dispose of the thousands of bushels of corn harvested that year. This is especially so when one remembers that the debtor never advised ABF of the situation or of what he was doing.

The debtor also tries to explain his conduct by suggesting that he did nothing in 1998 which he had not done in 1997, the first year he dealt with ABF. If ABF had

been aware of the debtor's actions in the prior year, this might give the debtor something with which to argue. Nonetheless, the court is not persuaded that ABF knew the debtor had a history of improperly disposing of its collateral. Furthermore, even if it did, the court is not satisfied that the misconduct in 1997 created a sufficient course of dealing between the parties which could have led the debtor to believe he had Plaintiff's permission to act as he did in 1998.

The debtor's improper disposition of the 1998 crops securing his obligation to the Plaintiff constitutes a willful and malicious injury. Pursuant to § 523(a)(6) his obligation to the Plaintiff is a nondischargeable debt. This conclusion renders it unnecessary to consider whether the debtor's obligation might also be excepted from discharge pursuant to § 523(a)(2) or (a)(4).

Judgment will be entered accordingly.