**In re Ronald PAUL, Debtor.**

**Park National Bank & Trust of Chicago, Plaintiff,**

v.

**Ronald Paul, Defendant.**

**Bankruptcy No. 00 B 28139.**
**Adversary No. 00 A 01001.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 14, 2001.

Bradley H. Foreman, Chicago, IL, for Plaintiff.

Horace Fox, Chicago, IL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Park National Bank ("Park") seeks to prevent Ronald Paul ("Debtor") from discharging a debt ($15,239.82) for overdrawn checks on Debtor's corporate checking account. Park argues that the debt is non-dischargeable under the fraud and willful damage to property exceptions of 11 U.S.C. § 523(a)(2)(A) and (a)(6), respectively. As a result of Debtor's default and entry of Default Order, Park moved for judgment on its Adversary Complaint. The Court now makes and enters its Findings of Fact and Conclusions of Law based on the defaulted allegations in Park's Complaint and the affidavit filed and admitted as part of the prove-up. Consistent with facts and conclusions of law enumerated below, Park's Motion is denied, and the Adversary proceeding will be set for trial to determine whether the debt is dischargeable.

### FINDINGS OF FACT

1. Park National is a bank organized under the laws of the United States of America, with its principal office in Chicago, Illinois.

2. Technographics is an Illinois corporation formed in 1991 with its registered office in Chicago, Illinois and its principal place of business in Broadview, Illinois.

3. Debtor was the president, sole shareholder, and director of Technographics.

4. On or about June 1, 1992, Debtor and his son Bryan Paul, as agents of Technographics, opened a corporate bank account No. 173851 at Park National Bank (the "account").

5. Debtor and his son, acting as officers of Technographics, issued a resolution whereby they were the only persons with access to the account.

6. Between 1992 and June of 2000 both Debtor and Bryan Paul wrote checks on the account. Many of these checks were written when Debtor and his son knew that the account lacked sufficient funds to cover the checks. Thus, the account was often overdrawn. However, upon being notified of an overdraft either Debtor or his son would deposit funds to cover the overdraft. For example, on April 27, 2000, the account was overdrawn by $5,202.93. Debtor then made a deposit of $15,876.10 on April 28 which brought the account into positive balance.

7. Based on this practice, Park would often pay checks on the account even though there were insufficient funds to cover those checks. The Complaint pleads 22 checks of this nature listed in ¶ 9:

| Check No. | Amount | Date |
| --- | --- | --- |
| 14118 | $ 388.08 | 6/5/00 |

| | | |
|---|---|---|
| 14122 | 405.00 | 6/5/00 |
| 1654 | 663.03 | 6/5/00 |
| 1656 | 825.12 | 6/5/00 |
| 1658 | 1,235.09 | 6/5/00 |
| 1657 | 2,185.70 | 6/5/00 |
| 14123 | 3,645.74 | 6/5/00 |
| 1655 | 929.57 | 6/6/00 |
| 14127 | 1,109.73 | 6/16/00 |
| 1651 | 740.34 | 5/22/00 |
| 1653 | 740.71 | 5/22/00 |
| 1652 | 1,107.85 | 5/22/00 |
| 14111 | 1,641.00 | 5/22/00 |
| 1649 | 669.16 | 5/23/00 |
| 1650 | 866.20 | 5/23/00 |
| 14113 | 1,910.00 | 5/23/00 |
| 14114 | 50.00 | 5/25/00 |

| 14116 | 60.10 | 5/26/00 |
| 14115 | 172.48 | 5/30/00 |
| 14120 | 573.15 | 5/30/00 |
| 14119 | 764.55 | 5/31/00 |
| 14117 | 789.40 | 5/31/00 |

8. On at least two occasions there were unusual transactions on the account. For example, on or about May 15, 2000, the account had a balance of $585.20. On May 16, 2000, Debtor deposited $7,364.50 to the account in the form of the following checks:

| Drawer | Amount |
| --- | --- |
| A & H Lithoprint | $7,338.50 |
| EnvelopeExperts, Inc. | $ 26.00 |

On the same day as this deposit, Bryan Paul executed check number 14110, in the amount of $7,338.50 back to A & H Lithoprint. Similar activity occurred on June 5, 2000, when Debtor deposited checks totaling $4,433.00 to the account:

| Drawer | Amount |
| --- | --- |
| All Printing & Graphics | $3,086.00 |
| EnvelopeExperts, Inc. | $ 29.00 |
| K & R, Inc. | $1,318.00 |

On the date those deposits were made, the account balance was negative $5,406.65. Yet on the same day as the deposit, Bryan Paul executed a check for $3,645.74 back to All Printing & Graphics.

9. Technographics has since gone out of business, but the date of that was not established. The last deposit made to the account was the aforementioned deposit on June 5, 2000.

10. Park has not been reimbursed for many overdrawn checks that it honored and has sustained losses totaling $15,239.82 for payments made on these checks and for service fees.

11. On September 26, 2000, Debtor filed a Voluntary Chapter 7 Bankruptcy Petition in which Park was scheduled as an unsecured creditor with a claim of $15,239.00. Park responded by filing the instant Adversary Complaint.

### CONCLUSIONS OF LAW

1. This matter is before the Court pursuant to 28 U.S.C. § 157 and Local District Court Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue lies in this district under 28 U.S.C. § 1409(a).

2. Fed.R.Civ.P. 55(b), made applicable to bankruptcy proceedings by Fed. R.Bankr.P. 7055(b), provides in relevant part:

Judgement by default may be entered as follows:

... If the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such appli-

cation. If, in order for the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings ... as it deems necessary and proper.

Fed.R.Bankr.P. 7055(b)(2).

■ 3. Judgment does not automatically follow after the entry of default. *Valley Oak Credit Union v. Villegas,* 132 B.R. 742, 746 (9th Cir. BAP 1991). Although, well-plead facts in the complaint are generally taken as true, the defendant does not by default admit conclusions of law. Therefore, it is left to the court to decide if the plaintiff is entitled to judgment as a matter of law. *Id.*

### Section 523(a)(2)(A)

■ 4. Under the Bankruptcy Code, a party seeking to except a discharge for fraud must establish each element of Section 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Martin,* 698 F.2d 883, 887 (7th Cir. 1983). The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start. *Grogan, Id.* at 286–87; *In re Scarlata,* 979 F.2d 521, 524 (7th Cir.1992).

Section 523(a)(2)(A) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

■ 5. Section 523(a)(2)(A) excepts debts from discharge that are based on either intentional misrepresentation or fraud. *McClellan v. Cantrell,* 217 F.3d 890, 893–94 (7th Cir.2000) (section 523(a)(2)(A) is not limited to false representations but includes actual fraud).

■ 6. Under Illinois law, corporate officers are personally liable for their own fraudulent conduct. *See In re Farbman,* 244 B.R. 135, 141 (Bankr.N.D.Ill.2000, Schmetterer, J) and cases cited.

■ 7. To except a debt from discharge the creditor must show either that: (1) the debtor made an intentional misrepresentation which the creditor justifiably relied upon, or (2) the debtor perpetrated a "positive" fraud against the creditor. *McClellan,* 217 F.3d at 894 (creditor reliance is only required when fraud takes the form of misrepresentation); *Matter of Mercer,* 246 F.3d 391, 407 (5th Cir.2001) (scienter distinguishes positive fraud from constructive fraud).

■ 8. Misrepresentation of the type that makes a debt nondischargeable under § 523(a)(2)(A) can be shown through conduct, and does not require a spoken statement. *Id.* at 404 (citation omitted); *In re Jairath,* 259 B.R. 308, 314 (Bankr.N.D.Ill. 2001) (citing *In re Arlington,* 192 B.R. 494, 498 (Bankr.N.D.Ill.1996)) (conduct intended to create false impression is misrepresentation).

■ 9. The Supreme Court has held that the standard applicable to the reliance element of § 523(a)(2)(A) is justifiable reliance. *Field v. Mans,* 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Whether a party justifiably relies on a misrepresentation is determined by look-

ing at the circumstance of a particular case and the qualities and characteristics of a particular plaintiff, and not by an objective standard. *Field*, 516 U.S. at 71, 116 S.Ct. 437. To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Matter of Mayer*, 51 F.3d 670, 676 (7th Cir.1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Mercer*, 246 F.3d at 413 (actual reliance is the equivalent of causation-in-fact).

■ 10. The determination of whether a defendant had the requisite scienter is a factual question which is resolved by a review of all of the relevant circumstances of a particular case. *In re Berz*, 173 B.R. 159, 162 (Bankr.N.D.Ill.1994); *In re Levitsky*, 137 B.R. 288, 290 (Bankr.E.D.Wis. 1992).

■ 11. The issuance of a check when Debtor knew that the account had insufficient funds is not, by itself, sufficient to except the debt from discharge under § 523(a)(2)(A) of the Code. *Williams v. United States*, 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (check is not a factual assertion but is merely an order to drawee to pay face amount to bearer); *In re Scarlata*, 979 F.2d 521, 525 (7th Cir.1992) (debtor's tendering of check unsupported by assets does not by itself establish a false pretense under § 523(a)(2)(A)); *Levitsky*, 137 B.R. at 290 (worthless check, without more, is not fraud); *In re Horwitz*, 100 B.R. 395, 398, 402 (Bankr.N.D.Ill.1989) (overdraft check is not a representation but principal shareholder and president's false representation that overdraft checks would be covered is sufficient to deny discharge under § 523(a)(2)(A)); *In re Pochel*, 64 B.R. 82, 85 (Bankr.C.D.Ill.1986) (debtor's inability to make check good should not be confused with desire to defraud creditor).

■ 12. Park has not shown even *prima facie* that Debtor intentionally made a misrepresentation that Park justifiably relied upon. Park contends that Debtor's practice of paying overdrawn checks was a form of representation that Debtor would reimburse Park for overdrawn checks, and that it justifiably relied on this inferred representation. (Park's proposed Conclusions of Law and Statement of Facts ¶ 10). Assuming arguendo that Debtor's prior pattern of paying overdrafts could under some circumstances constitute a representation which Park might justifiably rely upon, Park must still show that each check it seeks to recover on was motivated by an intent to deceive Park and not merely by a desire to pay company debts, and that Park justifiably relied on each check being made good. This it has not done.

■ 13. A number of factors have been found to be weighed to decide whether a debtor sought to defraud a credit card company. *See In re Dougherty*, 84 B.R. 653, 657 (9th Cir. BAP 1988). By analogy, Park might use similar factors to show that Debtor intended to defraud it by use of checks drawn on the company's account:

A. The length of time between when the checks were issued and the bankruptcy filing; (here three months);

B. Whether or not an attorney was consulted concerning the filing of bankruptcy before the checks were issued (not shown here);

C. The number of checks issued while the account had a negative balance and the length of time between the issuance of the checks and the last deposit that gave the account a positive balance (such details not clearly shown here);

D. Whether Debtor made excessive expenditures with no expectation of repaying Park for the overdrawn checks (not shown here);

E. Whether Technographics was still in business when the checks were issued and had income such that Debtor could reasonably expect the checks to be covered (business apparently still ongoing when checks issued);

F. Whether Debtor manipulated its checking account to induce Park to pay overdrafts by making fictitious deposits (arguably shown here);

G. Whether Debtor signed the checks or whether Debtor's son signed the overdrawn checks (no indication here of who signed checks);

H. Whether the corporate checks were issued to purchase personal items for Debtor (one check for $1,109.73 was paid to country club), but it is unclear whether such payment was benefit of Debtor or corporation (purpose of remaining checks not identified);

I. Whether Debtor personally benefitted by issuing checks to himself or his son while the account was overdrawn, or whether Debtor took advantage of Park's overdraft protection to reduce his personal liability for corporate obligations (two checks for a total of $1,565.34 to Bryan Paul issued before last deposit).

These factors, like those used to decide credit card cases, are not exhaustive of the ways in which Park can try to show Debtor's intent to defraud it, and Park need not show each and every element to prevail on its objection to discharge. However, based on the pleadings and the well-plead facts accepted therefrom, these factors presently weigh against Park's assertion that Debtor had the intent to defraud Park.

■ 14. Park's assertions are internally contradictory as to the number of overdrawn checks that were issued against the account. Park at one point identified 22 checks for $22,472.00 that it says were not paid (Proposed Findings of Fact and Conclusions of Law ¶ 12), but also argues its damages as $14,607.06 for unpaid checks less the service fees. (Proposed Findings of Fact and Conclusions of Law ¶ 13). The Complaint pleaded 22 checks (¶ 9). Thus, it is unclear how many checks were issued while the account was overdrawn. Evidence that Debtor issued a flurry of checks during the weeks after its account held a negative balance might be important in determining whether Debtor intended to defraud Park. However, whatever the number, Debtor might have issued the checks in the honest belief that the company would be able to cover the checks. But the inference of fraud might increase with the number of overdrafts and the duration over which the overdrawn checks were issued. Therefore, it is important that Park clearly show the number and dates of overdrawn checks.

■ 15. Park avers that Debtor induced it to continue to cover Debtor's overdrafts by making fictitious deposits to its account. (Park's Proposed Findings of Fact and Conclusions of Law ¶ 18). Indeed, no reason has been shown for the exchange of checks between Technographics, A & H Lithoprint and All Printing & Graphics. However, Park has failed to show *prima facie* that Debtor was aware of or participated in this scheme. Although, Debtor deposited the checks from both firms, the checks back to the firms were issued by Bryan Paul, Debtor's son and co-officer of Technographics. Section 523(a)(2)(A) reaches only conduct which is fraudulent at its inception. *McClellan,* 217

F.3d at 894. Debtor's act of depositing the two checks was not shown to have been fraudulent in and of itself; therefore, Park must establish that this conduct was part of a scheme to defraud it. Park contends that "there is a presumption that Defendant personally benefitted from the aforementioned checks written to the corporation by A & H Lithoprint and by All Printing & Graphics, and that these transactions did not represent bona fide business transactions of Technographics." However, there is no support in law for Park's presumption that Debtor engaged in fraudulent conduct. On the contrary, the exceptions to discharge should be strictly construed in favor of the Debtor's right to discharge its debts. *Id.* at 893. Therefore, Park must present evidence to make out each element of the requirements of § 523(a)(2)(A) in order to prevent Debtor from obtaining a discharge. *Jairath,* 259 B.R. at 314. Park has not yet shown facts that entitle it to judgment under 11 U.S.C. 523(a)(2)(A).

### Section 523(a)(6)

16. Park next argues that its claim is nondischargeable under § 523(a)(6), under which a debtor is barred from discharging a debt for the "willful" and "malicious" injury to another entity or its property. 11 U.S.C. § 523(a)(6).

17. To show that a debtor acted "willfully," the creditor must establish that the debtor subjectively intended the harm caused to the creditor, or that he believed the specific harm was substantially certain to occur. *In re Su,* 259 B.R. 909, 913 (9th Cir. BAP 2001); *In re Markowitz,* 190 F.3d 455, 464 (6th Cir.1999); *State of Texas v. Walker,* 142 F.3d 813, 823 (5th Cir.1998). Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that

the conduct will cause particularized harm; *In re Longley,* 235 B.R. 651, 656 (10th Cir. BAP 1999).

18. Showing that an act is wrongful is insufficient to except a debt from discharge under § 523(a)(6). *In re DeMarco,* 240 B.R. 282, 289 (Bankr. N.D.Ill.1999) (showing an intentional tort may be insufficient to except debt under § 523(a)(6)). Likewise, showing that an intentional act caused harm is not enough to render a debt nondischargeable. The creditor must establish that the debtor's purpose was to cause the particular harm, or that he believed his conduct was substantially certain to cause the resulting harm. *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

19. The second component of § 523(a)(6) is that the debtor's conduct must have been malicious. The test for maliciousness under § 523(a)(6) is (1) a wrongful act, (2) done intentionally, (3) which causes injury to the creditor, and (4) is done without just cause and excuse. *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994) (defining malicious as in conscious disregard of one's duties and without just case or excuse); *In re Jercich,* 238 F.3d 1202, 1209 (9th Cir.2001); *Su,* 259 B.R. at 914. A debtor does not have to act with ill will or a specific intent to do harm to the creditor for his conduct to be malicious. *Thirtyacre,* 36 F.3d at 700. Further, Just because an act is wrongful does not mean it is automatically malicious. *In re Russell,* 262 B.R. 449, 455 (Bankr.N.D.Ind. 2001) (citing *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989)).

20. To promote the debtor's fresh start, an exception to discharge under § 523(a)(6), like the exception under § 523(a)(2)(A), is narrowly construed and there is no authority to except a debt from discharge other than for the reasons enu-

merated in § 523 of the Code. *DeMarco,* 240 B.R. at 286.

21. As stated above, Park has not shown that Debtor intentionally sought to harm it. The issuance of overdrafts alone does not satisfy the willfulness requirement of § 523(a)(6) of the Code. If it did, the result would be to eviscerate the Code's fresh start policy and innocent debtors would be barred from obtaining a discharge because they issued overdrafts. However, if Park can establish that Debtor set out in a schedule to exploit Park's practice of covering overdrafts to defraud Park, then it may yet be able to show a willful injury. Thus, even if Park cannot show that each and every overdraft was issued for the specific purpose of defrauding it, if Park can show that Debtor knew that Park would cover the overdrafts and acted to cause Park to make payments which Debtor had no intent of reimbursing, then Park might satisfy the willfulness requirement of the statute. *Longley,* 235 B.R. at 657 (willful injury may be established indirectly by showing debtor had particularized knowledge of harm its actions would cause). Therefore, if Park can establish Debtor's participation in the alleged scheme to induce Park to cover overdrafts, it could establish the first prong of § 523(a)(6).

22. Moreover, while the exchange of checks between Debtor's company and other firms is not inherently an act of wrongdoing, if the exchange is intended to misrepresent the state of a Debtor's business so as to cause Park to be defrauded, then the conduct might be done in conscious disregard of Debtor's duties to Park and therefore might be malicious. Thus, if Park can establish that (1) Debtor was aware of the exchange of checks between Technographics and All Printing & Graphics and A & H Lithoprint and (2) that the purpose of that exchange was to defraud Park, then Park may show the second prong of § 523(a)(6). However, the pleadings and affidavits submitted by Park have as yet failed to establish that it is entitled to judgment under § 523(a)(6).

## CONCLUSION

Park's pleadings and affidavits have not established that the debt owed to it is nondischargeable under either § 523(a)(2)(A) or under § 523(a)(6). Park has not met its burden under either statute even *prima facie* for purposes of default judgment to show that Debtor engaged in the type of activity that Congress intended to except from discharge. Therefore, the Code's fresh start policy cannot be abrogated in the present case absent a further showing of evidence to warrant an exception to the policy of allowing debtor's to discharge their debts in bankruptcy. Park's motion for a default judgment must therefore be denied.

Pursuant to Order entered on this date, this matter will be set for trial to afford Plaintiff an opportunity to establish its case by evidence. Requests by Plaintiff for adequate time to obtain discovery from Defendant will of course be considered.