**In re James B. GREEN, Jr., and Tammy M. Green, Debtors.**

**Sears, Roebuck and Co., Plaintiff,**

v.

**James B. Green, Jr., Defendant.**

**Bankruptcy No. 02–82502.**
**Adversary No. 02–8192.**

United States Bankruptcy Court, C.D. Illinois.

July 1, 2003.

Mark A. Jackson, East Moline, IL, for debtors.

Frank A. Janello, Normal, IL, Andrew J. Nelson, Chicago, IL, for creditor.

### OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

This matter came before the Court for trial on the Complaint filed by Sears, Roebuck and Co. ("SEARS") against the Debtor, James B. Green, Jr. ("DEBTOR"). Brought pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(C), the Complaint seeks to have determined nondischargeable the sum of $9,253.62 in charges made by the DEBTOR on his SEARS Master-Card account within sixty days prior to his bankruptcy filing.

### FINDINGS OF FACT

The DEBTOR and his wife, Tammy M. Green (together, the "GREENS"), filed their Chapter 7 petition on May 29, 2002. The GREENS have two children, a daughter, fifteen, and a son, thirteen. At the time of the bankruptcy filing, the DEBTOR was a truck driver and his wife worked part-time for a janitorial service. Together, they took home $2,196.05 per month, according to Schedule I. On Schedule J, their monthly expenses total $2,884.18. They scheduled a 1994 Jeep Wrangler, valued at $6,500.00, secured by a lien in that amount to Timberland Auto. On Schedule F, the GREENS list six different credit card debts but fail to disclose the amount of each credit card balance, listing the amounts as "unknown." Even though the case was processed as a no asset case, one credit card creditor, Capital One, the issuer of two of the six scheduled cards, filed a proof of claim in the amount of $24,967.51.

At trial, the DEBTOR testified that their net monthly income in April, 2002, was $4,000.00 based on him working sixty to seventy hours per week at that time. His hours were reduced in May, and by the time of trial, he had been laid off. According to the DEBTOR, their monthly expenses as of April, 2002, were approximately $3,600.00. The DEBTOR testified that he had been experiencing financial troubles for about one year before bankruptcy. He was able to pay his bills only through several refinancings of a second mortgage. He first began thinking about filing for bankruptcy relief in April, 2002. He first met with his bankruptcy attorney on April 9, 2002.

The transaction that is the focus of this adversary proceeding is the DEBTOR'S purchase of the 1994 Jeep Wrangler from Timberland Auto Sales and a resulting dispute with Timberland's owner, Mike Bertelli. In March, 2002, the DEBTOR decided that he needed to replace his Chevy truck. After looking at several vehicles on Timberland's lot over a two-week period, the DEBTOR decided to buy the 1994 Jeep Wrangler for $6,000.00. With tax, title, license and document fee, the total purchase price came to $6,506.00. On

March 30, 2002, the DEBTOR signed a purchase order and paid the purchase price in full with a convenience check, drawn on his SEARS MasterCard account.[1] Bertelli deposited the convenience check at his bank that afternoon and told the DEBTOR that he could not remove the Jeep Wrangler from Timberland's lot until the check "cleared" and the funds were credited to Timberland's account. The convenience check transaction was debited to the DEBTOR'S SEARS MasterCard account on April 3, 2002.

On April 1, the DEBTOR told Bertelli that he had changed his mind about purchasing the Jeep Wrangler and that he wanted to cancel the transaction and get his money back. Bertelli refused the DEBTOR'S request.[2] On April 8, 2002, the DEBTOR contacted SEARS by telephone and stated that he wished to "stop payment" on the convenience check. SEARS advised the DEBTOR that that was not possible since the check had already been paid and posted to his account.[3]

The DEBTOR made two subsequent charges to the SEARS MasterCard account. On May 8, 2002, he ordered a hard top and hard doors for the Jeep Wrangler from "ATtheMART.com" and paid $937.45 by charging it to the MasterCard account. On May 16, 2002, he transferred a balance of $1,931.25 from a Discover credit card to the SEARS MasterCard. The DEBTOR also made two payments on the account, a $140.00 payment credited on May 2, 2002, and a $100.00 payment credited on May 28, 2002, the day before bankruptcy.

After the filing, the DEBTOR contacted SEARS and offered to reaffirm the credit card balance, but SEARS refused. The DEBTOR'S Statement of Intention did not list SEARS as a creditor with whom the DEBTOR intended to reaffirm. SEARS makes no claim of having a security interest in the Jeep Wrangler and the representation in the schedules that Timberland Auto held a lien on the Jeep Wrangler is incorrect, as the purchase price was paid in full. The DEBTOR testified that even though he could not afford to pay all of his bills, resulting in the bankruptcy, he still wanted to pay SEARS.

## ANALYSIS

Contending that the credit card charges made by the DEBTOR constitute an extension of credit obtained by actual fraud,

---

1. Several convenience checks were mailed to the DEBTOR by SEARS with a prior monthly statement. A convenience check is usable similar to a bank checking account check and is paid through the federal reserve collection system. Rather than resulting in a debit to the drawer's checking account, however, use of a convenience check creates a debit to the user's credit card account, the same as if the credit card itself was used to pay for the purchase.

2. A good deal of time was spent at trial by the DEBTOR and Bertelli describing their respective versions of the events surrounding the DEBTOR'S efforts to rescind his purchase of the Jeep Wrangler. The details of those conflicting stories are not repeated here as the Court does not consider them relevant to the issue before it.

3. Here again, there was much testimony at trial by the DEBTOR and the SEARS representative, Herman Pork, about the various communications made, the notes of those communications and the account entries that resulted. For example, SEARS initially, and incorrectly, treated the matter as a fraudulent transaction and credited the amount of the convenience check to the DEBTOR'S account. The charge was subsequently reinstated, and correctly so, since the DEBTOR voluntarily used the check for an authorized purpose. On April 23, 2002, the DEBTOR called SEARS and advised that his dispute with Timberland was resolved. From that point on, all parties considered the matter closed. The DEBTOR kept the Jeep Wrangler, Timberland kept the money, and SEARS kept the debt.

excepted from discharge under 11 U.S.C. § 523(a)(2)(A), SEARS argues that the DEBTOR could not have intended to repay the charges when made. Alternatively, SEARS asserts that the Jeep Wrangler, the hard top and hard doors are "luxury goods" and that the balance transfer was a "cash advance," as those terms are used in 11 U.S.C. § 523(a)(2)(C), so that the charges are presumed to be nondischargeable. The DEBTOR denies that Section 523(a)(2)(C) is applicable and maintains that he did, in fact, intend to pay SEARS.

A party seeking to except a debt from discharge for fraud must prove each element of Section 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest, but unfortunate, debtor a fresh start. *Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654; *Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir.1992).

Section 523(a)(2)(A) is not limited to false representations but includes actual fraud even if no affirmative representation is involved. *McClellan v. Cantrell*, 217 F.3d 890, 893–94 (7th Cir.2000). To except a debt from discharge, the creditor must show either that: (1) the debtor made an intentional misrepresentation upon which the creditor justifiably relied, or (2) the debtor perpetrated a positive fraud against the creditor. *McClellan*, 217 F.3d at 894 (creditor reliance is only required when fraud takes the form of a misrepresentation). Scienter distinguishes positive fraud from constructive fraud. *In re Mercer*, 246 F.3d 391, 407 (5th Cir.2001). The determination of whether a debtor had the requisite scienter is a factual question which is resolved by a review of all of the relevant circumstances of a particular case.

*In re Berz*, 173 B.R. 159, 162 (Bankr. N.D.Ill.1994); *In re Paul*, 266 B.R. 686, 694 (Bankr.N.D.Ill.2001).

With regard to credit card debt, the proper inquiry is whether the debtor subjectively intended to repay the debt. *In re Rembert*, 141 F.3d 277, 281 (6th Cir.1998). Although hopeless insolvency is circumstantial evidence of a subjective intent not to repay, the express focus must be solely on whether the debtor incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt. *In re Anastas*, 94 F.3d 1280, 1285–86 (9th Cir.1996). Proof of intent to deceive is measured by a debtor's subjective intention at the time the debt was incurred. *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr.N.D.Ill.1998). Subsequent inconsistent conduct, although admissible as circumstantial evidence of prior intent, does not necessarily control the determination. *In re Scarpello*, 272 B.R. 691, 701 (Bankr.N.D.Ill.2002).

Where applicable, the presumption provided by Section 523(a)(2)(C) is rebuttable. It can be overcome by evidence that the debtor experienced a sudden change in circumstances or that the debtor did not contemplate filing a bankruptcy petition until after the transaction took place. *In re Hulbert*, 150 B.R. 169 (Bankr.S.D.Tex.1993). The presumption shifts only the burden of going forward, and not the ultimate burden of proof, which remains on the creditor. Federal Rule of Evidence 301.

The Court finds that neither the 1994 Jeep Wrangler, an eight-year old vehicle worth $6,000.00, nor the hard top and hard doors necessary to winterize the vehicle, are luxury goods. *See, In re Davis*, 56 B.R. 120 (Bankr.D.Mont.1985) (used van not a luxury good). The term "cash advance" is a specific term that ap-

plies only when a debtor uses a credit card or other open-end credit plan to obtain cash. A balance transfer that shifts the debt from one creditor to another, but puts no cash in the debtor's pocket, is outside the scope of the term "cash advance." *In re Manning*, 280 B.R. 171 (Bankr.S.D.Ohio 2002). Accordingly, the presumption of Section 523(a)(2)(C) is not available to SEARS.

██ The task of proving a debtor's state of mind at the time a credit card is used is a very difficult one. *See, e.g., In re Mercer*, 246 F.3d 391, 409 (5th Cir.2001) ("A debtor rarely will admit card-debt is incurred with the intention of not paying it. . . ."). In evaluating a debtor's subjective intent at the time a credit card is used, a number of courts have considered the following twelve factors enumerated by the Ninth Circuit Bankruptcy Appellate Panel in *In re Dougherty*, 84 B.R. 653, 657 (9th Cir. BAP 1988):

(1) The length of time between the charges made and the filing of bankruptcy;

(2) Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

(3) The number of charges made;

(4) The amount of the charges;

(5) The financial condition of the debtor at the time the charges were made;

(6) Whether the charges were above the credit limit of the account;

(7) Whether the debtor made multiple charges on the same day;

(8) Whether or not the debtor was employed;

(9) The debtor's prospects for employment;

(10) Financial sophistication of the debtor;

(11) Whether there was a sudden change in the debtor's buying habits; and

(12) Whether the purchases were made for luxuries or necessities.

██ While the Dougherty factors may be helpful in determining the debtor's state of mind, their application should not necessarily be outcome determinative. *See, In re Rembert*, 141 F.3d 277, 282 (6th Cir.1998) (noting that " 'factor-counting' is inappropriate when applying a subjective standard"); *In re Hashemi*, 104 F.3d 1122, 1125 (9th Cir.1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997) ("[The *Dougherty*] factors are non-exclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent."). Bearing in mind that the *Dougherty* factors are merely guidelines and should not to be applied as a litmus test, the Court will consider each of these factors as it seeks to "determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *In re Murphy*, 190 B.R. 327, 334 (Bankr.N.D.Ill. 1995).

Factors 3, 6, 7, 8, 10 and 12 all clearly weigh in favor of the DEBTOR. The number of charges made is small. There is no allegation that the credit limit was exceeded. Multiple charges were not made on the same day. (This case does not have the traditional earmarks of credit card "loading.") The DEBTOR was employed at what was then a stable and fairly well-paying job. (Factor 9 is, therefore, not applicable.) The DEBTOR is financially unsophisticated. The charges were not made for luxury purchases.

Factor 4 and 5 weigh in favor of SEARS. The DEBTOR admitted being in poor financial condition for about one year prior to bankruptcy. The GREENS were

able to scrape by through several second mortgage refinancings and by the DEBTOR working seventy hours per week. The amount of the charges is large relative to the GREENS' financial condition.

Factor 11 is neutral. The purchase of a replacement vehicle is almost always going to represent a sudden change in a debtor's buying habits. But, here, the evidence was uncontradicted that the DEBTOR needed to replace his Chevy truck, which was in such poor condition that Bertelli would not even take it in trade. This is not a case where the DEBTOR went on a prebankruptcy buying spree.

Factors 1 and 2 are related. The charges were all incurred within sixty days of bankruptcy, a relatively brief period of time. The DEBTOR'S first visit to his bankruptcy attorney occurred on April 9, 2002, ten days after he purchased the Jeep Wrangler. The bankruptcy petition and schedules were signed by the GREENS on May 2, 2002. The DEBTOR'S purchase of the hard top and hard doors and the balance transfer both occurred after the DEBTOR signed his bankruptcy papers. Accordingly, these charges were made when the DEBTOR fully intended to file a Chapter 7 bankruptcy petition in the immediate future.

The Court rejects the DEBTOR'S testimony that he intended to pay for these debts by reaffirming with SEARS. Even if this Court was willing to accept at face value the DEBTOR'S self-serving assurances that he intended to reaffirm the debt to SEARS at the time these debts were incurred, the DEBTOR'S Statement of Intention, signed and dated by the DEBTOR on May 2, 2002, discloses that the only

unsecured debt the DEBTOR intended to reaffirm was his Discover Card. While a debtor's original statement of intention is not binding, that document strips the DEBTOR'S testimony of any credibility here.[4]

Apart from the weaknesses in the DEBTOR'S testimony itself, his position is unsustainable. Not only would it provide a refuge for every debtor who abuses credit cards on the eve of filing for bankruptcy, it would subvert the purpose of the provision as well as taint the reaffirmation process itself. A reaffirmation agreement is strictly voluntary, on behalf of both the debtor and the creditor. A creditor holding a potentially nondischargeable claim against the debtor may not be appeased by a debtor's offer to reaffirm. Though a reaffirmed debt may not differ in many respects from a nondischargeable debt, only the latter will remain enforceable after a subsequent filing. *See, In re Johnson*, 255 B.R. 696 (Bankr.E.D.Mich.2000).

Particularly important here is the unfettered right given to a debtor to rescind a reaffirmation agreement within sixty days. 11 U.S.C. § 524(c)(2)(A). As far as a creditor is concerned, until that time has passed, a debtor's intent to reaffirm a debt is nothing more than an unenforceable promise. As such, it cannot harbor a debtor from incurring debts which would otherwise be determined to be nondischargeable. The debtor's intent to repay which is the focus in credit card cases is the intent to repay the debt in accordance with the credit agreement, unhampered by any risks associated with a contemplated or immediate bankruptcy filing.[5]

---

**4.** The DEBTOR offered no explanation why the debt to SEARS was not included in his bankruptcy schedules. Nor did the DEBTOR explain the delay in the filing of the bankruptcy petition.

**5.** It is difficult for this Court to envision circumstances where debts incurred for purchases made after a debtor had signed a bankruptcy petition but before it is filed, would not be determined to be nondischarge-

Based on all the evidence, the Court finds that SEARS has carried its burden of proof with respect to the charge made on May 8, 2002, and the balance transfer on May 16, 2002.[6] Accordingly, the amount of $2,868.70, the sum of those transactions, is determined nondischargeable.

▓ A different result occurs when the Court considers the DEBTOR'S state of mind on March 30, 2002. The evidence is undisputed that he had not yet contemplated bankruptcy when he purchased the Jeep Wrangler. Even though he changed his mind about the purchase within two days and tried to cancel the transaction, this episode of "buyers regret" is not necessarily indicative of a fraudulent intent at the time of the purchase. If anything, it militates to the contrary, for had the DEBTOR purchased the Jeep Wrangler intending not to pay for it, why would he have tried so hard to convince Bertelli to cancel the purchase and, alternatively, to get SEARS to stop payment on the check?[7]

Nor is this case similar to the facts before this Court in two previous opinions relied upon by SEARS, *In re Brobsten,* 2001 WL 34076352 (Bankr.C.D.Ill.2001) and *In re Stewart,* 2001 WL 34076425 (Bankr.C.D.Ill.2001). In both of those cases, the evidence was overwhelming that the debtors were hopelessly insolvent at the time the nondischargeable credit card charges were made. Stewart owed credit card debt of $64,000.00, while earning only $605.00 per month. Brobsten owed credit card debt of $27,000.00 and her monthly income was $500.00 in Social Security Disability payments.

Here, SEARS failed to establish just how deep in debt the GREENS were. No evidence was presented as to the amount of the credit card balances listed on the schedules. Other than the proof of claim filed by Capital One, the record is devoid of any evidence of how much the GREENS owed on their credit cards. In addition, the DEBTOR was making $4,000.00 per month at the time he purchased the Jeep Wrangler. SEARS failed to prove that the DEBTOR was so far in

---

able. Addressing the significance given to a debtor's consultation with an attorney regarding bankruptcy, the court in *Matter of Schnore,* 13 B.R. 249 (Bankr.W.D.Wis.1981), quoting from *In re Schneider,* 3 B.C.D. 175 (D.Nev.1977), noted:

It is difficult to read the human mind as to the precise moment a person "decides" to file bankruptcy. It seems only fair that so long as defendant had called upon an attorney for that specific purpose and had considered and had been considering bankruptcy for some time she was at very least deceiving her creditors by giving a false impression that she intended to pay. It is plain that one who presents herself as a purchaser with good intentions should not be at the same time "considering" bankruptcy.... Certainly there is no pure unadulterated intention to pay when the transaction is shadowed by a pall of indecision as to whether bankruptcy will be filed. Business credit demands a more honest

state of mind and if there be reasonable doubt that payment will be made it borders on cheating and should not be condoned even though Bankruptcy Courts are certainly designed to enforce the humane law of discharge to aid bankrupts in a fresh start.

6. The Court also rejects the DEBTOR'S argument that the two payments made on the credit card account prove that he intended to pay SEARS. The amount of each payment was nominal and both payments were made on or after the date that the bankruptcy papers were signed.

7. The DEBTOR filed an Affirmative Defense as to the convenience check transaction, alleging that SEARS wrongfully failed to stop payment on the check. The evidence persuades the Court that SEARS did not wrongfully fail to stop payment as the check was paid prior to the time that the DEBTOR made the stop payment request.

debt as to be hopelessly insolvent at the time he purchased the Jeep Wrangler and this case is factually distinguishable from *Brobsten* and *Stewart.*

Although his dispute with Bertelli about reneging on the purchase of the Jeep Wrangler and his dispute with SEARS over stopping payment on the check, may have contributed to the DEBTOR'S decision to file for bankruptcy relief, these events occurred after the purchase on March 30, 2002. Based on all of the evidence, this Court finds that SEARS failed to prove that the DEBTOR did not intend to pay for the purchase price of the Jeep Wrangler at the time the purchase was made on March 30, 2002. Accordingly, the convenience check amount of $6,506.00 is dischargeable.

In its complaint, SEARS requests interest and attorney fees. No evidence of the applicable rate of interest, presumably a variable rate, was presented at trial. Therefore, the Court denies the request for prejudgment interest. SEARS may be entitled to an award of reasonable attorney fees, if provided for by the terms of the SEARS MasterCard cardholder agreement. *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670 (7th Cir.1995). SEARS is directed to submit an Application for Attorney Fees itemizing the fees it seeks to recover within twenty-eight days. The Application for Attorney Fees must set forth the terms of the agreement for attorney fees between SEARS and SEAR'S counsel for this adversary proceeding and must also attach a copy of the applicable cardholder agreement. The Application for Attorney Fees should be served on the DEBTOR'S attorney who shall have twenty-one days to file an objection, if any, to the Application for Attorney Fees.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

## *ORDER*

For the reasons stated in an Opinion filed this day, IT IS HEREBY ORDERED that:

1. The debt incurred by the DEBTOR to SEARS, from the DEBTOR'S use of a credit card convenience check to purchase a 1994 Jeep Wrangler for $6,506.00, is determined to be DISCHARGEABLE.

2. The transactions made by the DEBTOR on the SEARS MasterCard account on May 8, 2002, and May 16, 2002, in the amount of $2,868.70, are determined to be NONDISCHARGEABLE.

3. SEARS shall file an Application for Attorney Fees within twenty-eight days, including a detailed itemization of the fees it seeks to recover, the terms of its fee agreement with its attorneys, and a copy of the applicable cardholder agreement between SEARS and the DEBTOR.

4. The DEBTOR shall file an objection, if any, to SEAR'S Application for Attorney Fees within twenty-one days of its filing.

5. A final judgment will be entered thereafter setting forth the Court's ruling on the Application for Attorney Fees.