In re A. DeWayne CASSEL, II, Debtor.

**Thomas Alford and Lamar Harris, Plaintiffs,**

v.

**A. DeWayne Cassel, II, Defendant.**

Bankruptcy No. 03–81771.
Adversary No. 03–8149.

United States Bankruptcy Court, C.D. Illinois.

March 14, 2005.

Gary T. Rafool, Peoria, IL, for Debtor.

Timothy L. Bertschy, Peoria, IL, for Plaintiffs.

## *OPINION*

THOMAS L. PERKINS, Bankruptcy Judge.

Before the Court is the adversary proceeding brought by the Plaintiffs, Thomas Alford (ALFORD) and Lamar Harris (HARRIS) (together referred to as the PLAINTIFFS), seeking a determination of nondischargeability under Section 523(a)(2) for a debt owed to each of them by the Debtor, A. DeWayne Cassel, II

366

(DEBTOR). The PLAINTIFFS invested $60,000 in a business owned and operated by the DEBTOR and allege that they were deceived as to the financial condition of the company.

### BACKGROUND

ACT Bending & Steel Co., Inc. (ACT) was a metal fabricator of tubular products for close to thirty years. The business, begun by Alvie Cassel and his wife, the DEBTOR'S parents, was one of the oldest minority owned businesses in Peoria, Illinois. In 1996, the DEBTOR purchased the business from his father for $375,000, giving him a promissory note. The DEBTOR was the sole shareholder and officer. In 1999, the DEBTOR borrowed approximately $1.3 million guaranteed by the Small Business Administration (SBA) for renovations. Both the DEBTOR and his other corporations guaranteed the debt.

By the early part of 2001, ACT had lost a major customer and was experiencing financial difficulty. The DEBTOR stopped taking a salary and began looking for investors. He mentioned his search to Bernard Dotson, a program manager for Mitsubishi working in the field of minority supplier development. ACT had participated in Mitsubishi's first mentoring program. Mitsubishi had teamed ACT up with Bundy Corporation and Bundy International, one of its primary tube suppliers, in order for ACT to learn from Bundy and to develop the techniques necessary to become a direct supplier to Mitsubishi.

ALFORD and HARRIS, college classmates of Bernard Dotson, dreamed of owning their own business together. Since their graduation from Purdue University, ALFORD had acquired extensive knowledge in corporate finance and HARRIS had focused upon manufacturing. After earning a degree in Industrial Engineering from Purdue, ALFORD received a Masters in Finance, Corporate Accounting and Entrepreneurship. He also has a Masters in Government Contracting from George Washington University. ALFORD worked as an engineer for General Motors, finance manager for Kraft Foods, finance associate for Chrysler and a financial comptroller for Sarah Lee Bakery.

HARRIS also earned an undergraduate degree in Industrial Engineering. After receiving an MBA from Lawrence Tech, he worked for Daimler Chrysler group for seventeen years. Specializing in the field of manufacturing and more particularly in process redesign, he traveled extensively for Daimler Chrysler, assessing manufacturing operations, identifying areas of waste and streamlining production. HARRIS and ALFORD had both worked hard and had made financial sacrifices in order to save funds available for investment to pursue their dream.

In late April, 2001, ALFORD received a call from Bernard Dotson informing him of the DEBTOR'S need of equity contributions for ACT and his interest in investors with backgrounds in finance and operations. After discussing the opportunity, ALFORD and HARRIS decided to investigate. HARRIS visited ACT first. Bernard introduced HARRIS to the DEBTOR and the DEBTOR gave HARRIS a tour of the facility, including the vacant second floor. HARRIS' primary objective was to assess the manufacturing operations and to gauge ACT'S potential for expansion. The DEBTOR showed HARRIS some of the products, including a prototype for Harley Davidson and discussed ACT'S relationship with Caterpillar and Mitsubishi. During the meeting, the DEBTOR advised HARRIS that ACT was going through a down cycle and that he was looking for investors to provide a cash infusion.

HARRIS left ACT with a very favorable impression.

ALFORD, having talked with the DEBTOR by phone after HARRIS' visit, came to Peoria in early May to view the facility and meet with the DEBTOR. After being greeted by the DEBTOR'S wife, Joelle, ALFORD was shown into the newly remodeled conference room and introduced to the DEBTOR'S father. ALFORD was also taken on a tour of the entire facility by the DEBTOR. ALFORD noted that some of the equipment in the production area was "state of the art" and considered that the empty warehouse area could easily house four small businesses. Upon completing their walkthrough, the DEBTOR and ALFORD returned to the DEBTOR'S office to continue their discussions regarding ACT'S financial status. ALFORD had a line of questions for the DEBTOR, primary of which was the amount of ACT'S debt. According to ALFORD, the DEBTOR told him the amount of the debt was $1.2 million.[1] Although ALFORD considered the debt to be high for a small business, he did not view it as alarming, based on the renovations and the empty space available for expansion or lease. ALFORD asked the standard questions, inquiring as to ACT'S income statement, balance sheet, accounts payable and accounts receivable. The DEBTOR gave ALFORD a list of the accounts payable generated from his computer program, penciling in notations and specific payment terms with regard to each account. In response to ALFORD'S request for the current balance sheet and income statement, the DEBTOR stated that they were not available because the bookkeeper had adjustments to make, but

that the DEBTOR would get them for him upon their completion.[2]

The DEBTOR told ALFORD that, as his father's only son, the building, then owned by his father, would belong to him upon his father's death. He told ALFORD that the building was not for sale because the Cassels wanted to keep it in the family. If HARRIS and ALFORD were interested, however, the DEBTOR assured ALFORD that his father would agree to a long-term lease. Based on his conversation with the DEBTOR, ALFORD inferred that ACT had been prosperous in the past and that its current financial plight was only temporary. Like HARRIS, ALFORD'S first impressions were very positive.

After conferring with one another, HARRIS and ALFORD agreed to move forward. HARRIS relied on ALFORD to continue to gather information from the DEBTOR. ALFORD reviewed ACT'S payroll register, updated accounts receivable reports, work in process report and accounts payable aging reports. ALFORD received the information piecemeal, and each batch of documents would generate additional inquiries of the DEBTOR. ALFORD prepared a series of computer generated spread sheets pertaining to ACT'S financial condition, creating a new version to reflect the most recent figures received from the DEBTOR. ALFORD continued to press the DEBTOR for the balance sheet and income statement, but the DEBTOR always had an excuse to put him off, responding that the documents would be forthcoming when prepared. ALFORD'S attempts to access the DEBTOR'S bank accounts "on line" for monitor-

---

1. *According to the DEBTOR, ALFORD only asked about the amount of the SBA debt and was advised it was between $1.2 and $1.4 million. ALFORD maintains he was not even told of the SBA loan until long after the first* visit. *The Court credits ALFORD'S version as truthful.*

2. ACT'S fiscal year ended March 31, 2001.

ing purposes were also unsuccessful, although the DEBTOR had purported to take the necessary steps to enable ALFORD to do so, by giving him the account numbers and the requisite password.

At the DEBTOR'S suggestion, a meeting was arranged with National City Bank in order to introduce ALFORD and HARRIS, and to advise the bank of their revitalization strategy for ACT. On May 29, ALFORD made his second trip to Peoria, and accompanied by the DEBTOR and Alvie Cassel met with the DEBTOR'S personal banker and another bank officer and presented a power point presentation detailing their turnaround plans for ACT. HARRIS, unable to make the trip, participated in the meeting by teleconference. Although no final agreement had been reached, the terms of the proposal presented to the bank provided for ALFORD and HARRIS to purchase a 51% equity interest in ACT for the sum of $180,000, to be paid in six equal payments of $30,000, with the initial payment due upon the signing of a purchase agreement. The DEBTOR would continue as Chief Executive Officer and ALFORD'S role would be that of Chief Financial Officer. HARRIS was not going to relocate to Peoria, but would act as Vice President of Manufacturing Operations.

At this same time, the DEBTOR complained that the process was taking too long and advised ALFORD that ACT needed an immediate cash infusion. The DEBTOR attached a post-it note to accounts receivable/payable data sent to ALFORD which read "Please be aware that it is becoming increasingly difficult to hold-off payment w/some of our vendors. We need to move swiftly if this is going to be successful. DeWayne." The DEBTOR also told ALFORD that $30,000 was not sufficient and that ACT needed $60,000 or more in the near future.

The parties also began the process of putting the terms of the deal into writing. They prepared a written agreement titled "Letter of Intent for Purchase of Common Stock" which outlined the terms of the purchase of a 51% interest in ACT by ALFORD and HARRIS for the price of $180,000. Upon signing the Letter of Intent, ALFORD and HARRIS were to make an initial payment of $60,000 to ACT to be used as working capital, a doubling of the amount contemplated in the previous presentation to National City Bank. After a due diligence period for further investigation into ACT'S financial condition, it was provided that the parties would execute a written Purchase Agreement by July 1, 2001. An additional $30,000 was due at that time followed by three payments of $30,000 each, due in thirty-day increments after the signing of the Purchase Agreement. The Letter of Intent specified that if the planned purchase did not close, ACT would repay the initial $60,000 infusion within six months.[3]

On the afternoon of June 1, 2001, ALFORD sent a series of emails to the DEBTOR, including revised cash flow statements and spread sheets for ACT. Included in the itemization of ACT'S monthly liabilities were SBA loan payments of $12,806, as well as a Citibank loan, a Bank One line of credit and a car loan to Chrysler Financial. That analysis shows ACT'S operations resulting in a loss

---

3. The Letter of Intent calls the $60,000 payment a "Break Up Fee." A break up fee, in the bankruptcy context, is "a fee paid to a potential acquirer of a business or certain assets by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met." *In re Integrated Resources, Inc.*, 135 B.R. 746 (Bankr.S.D.N.Y. 1992). The payment by ALFORD and HARRIS is more in the nature of a down payment.

of $130,796, prior to an equity infusion of $60,000.

The DEBTOR then advised ALFORD that the initial $60,000 payment contemplated to be due upon signing the Letter of Intent was needed as soon as possible. He suggested that he could meet with ALFORD in Chicago on Sunday, June 3, to exchange the signed Letter of Intent for the $60,000. Confronted with the DEBTOR'S insistence, ALFORD agreed. On Sunday, June 3, 2001, the DEBTOR and his wife drove to Chicago and met with ALFORD at a suburban shopping mall. The DEBTOR delivered the Letter of Intent signed by him and his father in exchange for two checks totaling $60,000.[4] At ALFORD'S direction, the DEBTOR also gave ALFORD copies of several checks made payable to creditors of ACT as evidence of his intent to use the funds to pay vendors. ALFORD'S two checks totaling $60,000 were deposited by the DEBTOR on Monday, June 4, 2001.

The next day, June 5, the DEBTOR sent an email message to ALFORD containing ACT'S accounts payable, its balance sheet and its income statement for the year ending March 31, 2001. This was the first time that ALFORD had seen the balance sheet and income statement despite repeated prior requests. The income statement reflected a net loss of $441,618. The balance sheet disclosed Total Liabilities of $2,191,201, including Long-term Liabilities of $1,900,154. The long-term debts included the SBA debt of $1,416,868, other bank loans totaling $131,990 and a debt to Alvie Cassel of $351,292.[5] ALFORD, stunned by the debt figures, contacted HARRIS

with the bad news that they had been "taken."

ALFORD called the DEBTOR to demand the $60,000 back but was advised that the money was spent. Notwithstanding this turn of events, the DEBTOR began pressuring ALFORD for the second payment called for by the Letter of Intent, warning that the suppliers would shut down the business if they remained unpaid. Understandably, ALFORD and HARRIS declined to make any further payments. Upon reflection, however, ALFORD and HARRIS decided they had no choice but to continue with the stock purchase if they ever hoped to recover their $60,000.

The DEBTOR then advised ALFORD and HARRIS that National City Bank would require them to personally guarantee ACT'S debt if they were to acquire a majority interest in the company. In order to avoid the personal guarantee, they prepared a purchase agreement providing for the purchase of a reduced percentage of 19.5% of the stock by each of them, for the sum of $137,647.00 less the $60,000 already paid, with the balance to be paid in six equal monthly payments of $12,941.17. The agreement provided for a 99–year option to purchase an additional 12% of the stock for $42,353, to be exercised only after the repayment of the SBA loan. In addition, the agreement provided for the forgiveness of Mr. Cassel's debt.

Key to this plan was a long-term lease of the building, which they hoped would provide a significant source of income, independent of ACT'S financial recovery. ALFORD and HARRIS drew up a 99–year

---

4. ALFORD and HARRIS, while not formal partners, participated in the business investment together. Although the checks given to the DEBTOR were drawn only on ALFORD'S accounts, the testimony of both ALFORD and HARRIS infers an equal contribution.

5. The DEBTOR testified that his father had previously forgiven the debt. Contrary to this testimony, however, Alvie Cassel filed a proof of claim in ACT'S bankruptcy case in the amount of $773,000, stating the basis for the claim as "note and remainder of lease."

lease, which also provided for a purchase option for $150,000. The lease was sent to the DEBTOR at the end of June, but he did not respond.

In mid-June, at the DEBTOR'S request, ALFORD prepared a second power point presentation for National City Bank, requesting a line of credit for $50,000. The DEBTOR forwarded the request to the Bank, but it was not pursued. In an attempt to repay ALFORD and HARRIS, the DEBTOR began soliciting other parties to purchase an interest in ACT. Although the DEBTOR solicited an offer from a long-time employee, nothing came of it and the DEBTOR had run out of options.

ACT closed its doors in early August and filed a Chapter 7 petition on September 6, 2001.[6] Just prior to filing, ACT transferred all of its pledged business fixtures, machinery, equipment, inventory and receivables to National City Bank and the SBA. According to the schedules filed in that case, ACT had priority claims of $63,065 and general unsecured claims of $2,356,962. The TRUSTEE recovered approximately $56,000 and has made final distribution to creditors. Allowed priority claims were paid in full and general, unsecured creditors received a 4% distribution. Neither ALFORD nor HARRIS filed a claim in ACT'S bankruptcy case, but brought suit against the DEBTOR in state court.

The DEBTOR filed a Chapter 7 petition on April 7, 2003. The DEBTOR'S wife, Joelle, did not join in the petition. The DEBTOR owns no nonexempt assets and listed unsecured claims, including the corporate debts, of $2,368,034. ALFORD and HARRIS brought this adversary proceeding under Section 523(a)(2), alleging both that the debt was obtained by false pre-

tenses, false representations and actual fraud and that the DEBTOR supplied AL-FORD and HARRIS with false information regarding ACT'S financial position. The DEBTOR denies making any false statement. A two-day trial on the complaint was held on August 31, 2004 and September 16, 2004.

## ANALYSIS

### Standards for Nondischargeability

A creditor seeking to establish an exception to the discharge of a debt bears the burden of proof. *Matter of Scarlata*, 979 F.2d 521 (7th Cir.1992). A creditor must meet this burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor in order to effectuate the debtor's fresh start. *Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir.1994).

### Section 523(a)(2)

Section 523(a)(2) of the Bankruptcy Code provides as follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing-

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

---

6. Case No. 01–83821.

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

■■ Section 523(a) has two separate components. Section 523(a)(2)(A) pertains to debts resulting from false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. Section 523(a)(2)(B) addresses the exception carved out from (a)(2)(A), requiring that such a statement be in writing in order to form the basis for a nondischargeable debt. The two provisions are often regarded as mutually exclusive. *In re Ophaug,* 827 F.2d 340 (8th Cir.1987); *In re Holstein,* 272 B.R. 463 (Bankr.N.D.Ill. 2001). Just what is meant by "a statement respecting the debtor's or an insider's financial condition," is, however, subject to different interpretation. *In re Bogdanovich,* 292 F.3d 104 (2nd Cir.2002); *In re Joelson,* 307 B.R. 689 (10th Cir. BAP 2004). Some courts employ a narrow interpretation, limiting the application of (a)(2)(B) to financial-type statements, such as balance sheets, income statements or similar documents from which an entity's overall financial picture can be ascertained. *Joelson, supra; In re Mulder,* 306 B.R. 265 (Bankr.N.D.Iowa 2004) (statements need not be "traditional" but must indicate debtor's overall financial condition). Other courts adhere to a broader view, considering any misrepresentation concerning a debtor's assets or liabilities or any other aspect of the debtor's financial condition to be within the ambit of (a)(2)(B). *In re*

*Priestley,* 201 B.R. 875 (Bankr.D.Del.1996)(characterizing the broad definition as the majority view). Under the broader view, based on the juxtaposition of subsections (a)(2)(A) and (a)(2)(B), an oral misrepresentation respecting any aspect of a debtor's financial condition can never lead to a determination of nondischargeability.

The complaint filed by ALFORD and HARRIS does not specify whether they are proceeding under Section 523(a)(2)(A) or (a)(2)(B). Characterizing this case as a story of deception and misrepresentation they argue that the DEBTOR provided information, both orally and in writing, that was inaccurate and incomplete. The focal point of their claim against the DEBTOR is his oral representation that the debt of ACT was $1.2 million. Neither ALFORD and HARRIS nor the DEBTOR addressed this important quandary. A determination that the DEBTOR'S false statement as to the amount of ACT'S liabilities is nonactionable under either provision because it was not made in writing, would be, in this Court's view, the wrong result. An examination of the historical background and the relationship between these two provisions is helpful in understanding the intended reach of Section 523(a)(2) and the correct disposition of ALFORD and HARRIS' claims against the DEBTOR.[7]

Section 523(a)(2)(B) has its roots in the Amendatory Act of 1903 to the Bankruptcy Act of 1898, which added the following grounds under Section 14c for objecting to a debtor's discharge where the debtor had

(3) obtained property on credit from any person upon a materially false statement in writing made to such person for the purpose of obtaining such property on credit.[8]

---

**7.** The history of the Bankruptcy Act of 1898 and the amendments thereto are taken from Vol. 10, Appendix, *Collier on Bankruptcy* (14th Ed.1978).

**8.** 32 Stat. 797. The provision was amended to read as follows by Act of June 25, 1910, 36 Stat. 838:

In order for a discharge to be denied under this provision, the false statement must have been in writing. Oral statements, though unquestionably false and fraudulent, were not within the statute. *See, International Shoe Co. v. Kahn,* 22 F.2d 131 (4th Cir.1927). From its inception, the term "false statement" was accorded a narrow and well-understood meaning. Speaking to its definition, the court in *In re Rea Bros.,* 251 F. 431, 432 (D.Mont. 1917), stated:

> [Paragraph 3 of Section 14] was introduced into the law in 1903 .... Even before 1903 the law dealt with false representations, providing that certain debts for obtaining property by false representations were not released by discharge. It is believed Congress by 'false statement' altogether different in phraseology from, and importing false representations and more, intends the financial statements well known in the commercial world, setting out assets and liabilities, disclosing net worth, and made to mercantile agencies and others expressly as a basis for credit. In law, statement generally means more than representation, in that it deals with particulars or facts from which totals and conclusions may be computed, rather than deals with merely totals or conclusions.[9]

An amendment in 1926 added the words "respecting his financial condition" at the end of the paragraph, reinforcing that earlier interpretation.[10] Looking to the related provision of Section 14c(2) which denied discharge to a debtor who had "destroyed, mutilated, falsified, concealed, or failed to keep or preserve books of account or records, from which his financial condition and business transactions might be ascertained," the court in *In re Current,* 63 F.2d 640 (7th Cir.1933), found "no room for doubt as to its meaning."

In 1960, Section 14c(3) was amended to limit the exception to a debtor engaged in business.[11] The penalty of a complete denial of discharge was regarded as too severe for a consumer debtor.[12] Behind the amendment was the "practice of unscrupulous lenders of condoning and even encouraging the issuance of statements omitting debts with the deliberate intention of obtaining a false statement for use in the event the borrower subsequently went into bankruptcy."[13]

In contrast, Section 523(a)(2)(A) evolved from Section 17a(2) of the Bankruptcy Act of 1898, setting forth the exceptions to the

---

(3) obtained money or property on credit upon a materially false statement in writing, made by him to any person or his representative for the purpose of obtaining credit from such person.

**9.** The court recognized that the provision was not limited to formal financial statements, adding that "other than financial statements as commonly understood may be within section 14, if false and distinguishable from mere representations." 251 F. at 432.

**10.** Act of May 27, 1926, 44 Stat. 662. After the 1926 amendment, the provision read:

(3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing, or causing to be made or published, in any matter whatsoever, a materially false statement in writing respecting his financial condition.

**11.** Pub.L. No. 86–621, 86th Cong., 2d Sess. (July 12, 1960), 74 Stat. 408. The amendment provided that the discharge could be denied if the false statement was made "while engaged in business as a sole proprietor, partnership, or as an executive of a corporation ...."

**12.** Senate Report No. 1688, 86th Cong., 2d Sess. (1960), U.S.Code Cong. & Admin.News 1960, pp. 2954, 2955.

**13.** *See,* 1A *Collier on Bankruptcy* Par. 1401[4.4] at 1256–57 (14th Ed.1978).

dischargeability of a particular debt.[14] Aptly described as an "evolutionary product,"[15] this provision excepted from discharge debts for "judgments in actions for frauds, or obtaining property by false pretenses or false representations."[16] Viewed as totally independent of the discharge exception which required the false statement to be in writing, a false representation did not need to be in writing. *Gear v. Davis*, 20 Utah 2d 184, 435 P.2d 923 (1968). Oral misrepresentations made to procure a loan were given no protection. *Id.* This exception for false representations also encompassed false written financial statements. *In re Armour*, 186 F.2d 503 (7th Cir.1951).

In 1960, in conjunction with the limitation of the exception to discharge for materially false statements by business debtors, Section 17(a)(2) was amended to insure that such debts were not affected by discharge.[17] After the amendment, Section 17(a)(2) provided that a discharge released the debtor from all debts except such as:

"are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with the intent to deceive...."[18]

Like the discharge exception, the added language was limited to the obtaining of credit. The provision was regarded as having no application to other types of liabilities, such as investments. *See, In re Ketter*, 1 B.R. 510 (E.D.Wis.1979). Courts continued to hold that debts for money or property obtained by false oral representations were nondischargeable under the general language of Section 17(a)(2). *Carini v. Matera*, 592 F.2d 378 (7th Cir.1979). Taking affront with the proposition that oral misrepresentations were sheltered from nondischargeability, the court in *Gear* stated:

[The debtor's] whole argument is not so much that he did not misrepresent, but that he did not do it in print. He urges, in substance and effect, that bankruptcy will launder oral deceptions, but not written ones. That simply suggests that one should talk a lot, write nothing, be illiterate, but highly vocal, and thus avoid responsibility.

20 Utah 2d at 185, 435 P.2d at 923.[19] An amendment in 1970 did not affect the provision at issue here.

**14.** 11 U.S.C. § 35(a)(2).

**15.** *See*, 1A *Collier on Bankruptcy*, Par. 17.01[1] at 1575.

**16.** In 1903, the provision was substantially amended to provide an exception for "liabilities for obtaining property by false pretenses or false representations ...." The Act of 1938 retained the provision, with the addition of the term "money."

**17.** Given the prior cases reaching that result, the incorporation of that provision merely codified the existing case law. *See*, 1A *Collier on Bankruptcy*, Par. 17.01[3.1] at 1578.

**18.** Pub.L. No. 86–621, 86th Cong., 2d Sess. (July 12, 1960), 74 Stat. 409 (1960).

**19.** In *Talcott v. Friend*, 179 F. 676 (7th Cir. 1909), *aff'd* 228 U.S. 27, 33 S.Ct. 505, 57 L.Ed. 718 (1913), the Seventh Circuit rejected the debtor's contention that a prior ruling in his favor on an objection to his discharge under Section 14c, barred a later action by the creditor under Section 17(2) to determine that the debt was not affected by the discharge for fraud, concluding that Congress could not have intended the "absurdity that deceivers, despite their discharges, should remain liable for oral deceits although excused from written deceits."

When Congress enacted the Bankruptcy Code in 1978,[20] it eliminated the false statement of financial condition as a basis for objecting to the debtor's discharge. It also changed the format of Section 523(a)(2), adding actual fraud to false representations and false pretenses, and delineating between those three grounds for nondischargeability and "statements respecting … financial condition." Legislative history proclaims that only "small modifications" were made to the exception to discharge based on false financial statements, referring to the inclusion of a debt for "services;" the added requirement that the creditor's reliance be reasonable; and the provision granting costs, attorney fees and damages to a consumer debtor when the filing of the creditor's complaint was not substantially justified.[21] There is no reference in the legislative history of Section 523(a)(2) that Congress intended a marked departure from case law construing the predecessor statute. As a general rule, if Congress intends for legislation to change an interpretation, that intent will be clearly expressed. The Bankruptcy Code should not be interpreted to override past bankruptcy case law absent a specifically expressed contrary legislative intent. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990).

Invoked by those courts that advance the narrow view that Section 523(a)(2)(B) only encompasses false financial type-statements, the legislative history of these provisions plays a major role. *In re Joelson*, 307 B.R. 689 (10th Cir. BAP 2004). Those courts also point to the repeated references to "false financial statements" throughout the case law and the legislative history of the amendatory acts, not the least of which was that by the Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Given considerable importance is the purpose underlying the provision, viewed as important today as when it first appeared:

> Subdivision (B) and its predecessors (dating back to 1903) were designed to protect debtors from abusive lending practices. Consumer finance companies sometimes coaxed potential borrowers into submitting incomplete financial information in the inadequate space provided in the lender's disclosure form. The lender then induced the borrower to certify the completeness of the information. The form also contained a provision that the lender relied on the form in granting the loan, although the lender had access to credit information to verify the debts listed. Following bankruptcy, the lender used the incomplete financial statement to support a challenge to the dischargeability of the debt based upon fraud.

*In re Alicea*, 230 B.R. 492, 502–03 (Bankr. S.D.N.Y.1999).

The proponents of the broad view rely on the plain meaning rule, which requires courts to look to the plain wording of the statute unless the statute is ambiguous or its literal application would produce an absurd result. For those courts, there is no need to resort to the legislative history.[22] The fallacy in that approach, in this Court's view, is that the long-standing language which now appears in Section

---

**20.** Bankruptcy Reform Act of 1978, Pub.L.No. 95–598 (1978).

**21.** H.R. 95–595, 95th Cong., 1st Sess. 129–131(1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

**22.** Some courts have found the legislative history to be less than clear, a conclusion with which this Court simply cannot agree.

523(a)(2)(B) has never been given its "plain meaning." To do so now by broadly interpreting it as encompassing any statement touching upon one's financial situation is to disregard a century of case law to the contrary.

Accordingly, this Court does not believe that the DEBTOR'S oral representation of the amount of ACT'S total liabilities is a "statement respecting . . . financial condition" within the meaning of Section 523(a)(2). Such a determination would have little impact in this case with respect to Section 523(a)(2)(B). The DEBTOR'S statement could not serve as the basis of a determination of nondischargeability of the $60,000 debt under Section 523(a)(2)(B) because it was not in writing. Because ALFORD and HARRIS make no claim that the written information that the DEBTOR supplied to ALFORD contained any false figures or data that is incorrect, they have no cognizable claim under that provision. If ALFORD and HARRIS are to prevail, their claim against the DEBTOR must hold up under Section 523(a)(2)(A). A determination by this Court that the DEBTOR'S oral representation is not a "statement respecting . . . financial condition" would also mean that it would not automatically fall outside the realm of Section 523(a)(2)(A). That result would be in keeping with the long-standing history, demonstrated by the foregoing chronicle, of making oral misrepresentations actionable under this provision.

 But the Court's ruling in this case need not rest on such polemic grounds. Much more than the DEBTOR'S false oral statement concerning the total amount of ACT'S liabilities was established at trial. Actual fraud, an independent ground for nondischargeability under Section 523(a)(2), brought to the foreground in the Seventh Circuit Court of Appeals decision in *McClellan v. Can-*

*trell,* 217 F.3d 890 (7th Cir.2000), encompasses more than misrepresentations. Rejecting the restrictive view that fraud always requires a misrepresentation, the court stated that actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." The court explained that:

[F]raud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling and any unfair way by which another is cheated.

*Id.* at 893. It may consist of something said, done or omitted. In order to prevail under such a theory, the creditor need establish only that "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud gave rise to the debt that is the subject of the discharge dispute." *McClellan; In re Philopulos,* 313 B.R. 271 (Bankr.N.D.Ill.2004).

Based on that broad definition, the Court finds that the DEBTOR defrauded ALFORD and HARRIS by deceiving them as to ACT'S true financial condition and by tricking them into making the $60,000 contribution before disclosing ACT'S complete and accurate financial picture. Despite repeated requests from ALFORD, the DEBTOR held off producing ACT'S balance sheet and income statement while at the same time ratcheting up the pressure for an immediate cash infusion, of twice the amount originally contemplated, through pleas of urgency such as that the vendors would not wait and that the transaction must move more quickly. Ultimately, that pressure culminated in the Sunday

meeting at a suburban Chicago shopping mall to obtain the $60,000.

This is not a case where pertinent financial information was never sought. Rather, the DEBTOR blocked ALFORD and HARRIS from ascertaining the true facts. The DEBTOR seemingly wishes to pass off as coincidental the delivery of ACT'S balance sheet and income statement to ALFORD on the day after the $60,000 was deposited and spent. But ACT'S bookkeeper, whom he initially blamed for the delay, never testified and the DEBTOR offered no explanation for how it was that the critical financial statements suddenly became available immediately after the initial cash investment was paid. Unexplained, the timing is simply too much to accept as happenstance.

The DEBTOR maintains that ALFORD and HARRIS were not swindled. It is true that both ALFORD and HARRIS are highly educated and experienced businessmen. They knew that the DEBTOR was desperately seeking a substantial cash infusion because ACT was in dire need of capital. It is also true that ALFORD and HARRIS were aware that the funds were going to be used up almost instantaneously and that ACT would not have sufficient funds to repay them the $60,000, without an upturn in business. But their belief that the cash flow problem was only temporary was founded on the DEBTOR'S representations to them. ALFORD and HARRIS acted hastily by advancing the funds before knowing ACT'S complete financial picture, but that haste is exactly what the DEBTOR'S scheme was intended to cause. It is no defense for one who perpetrates a fraud to complain that the victims should not have been so gullible.

Given this Court's determination that the DEBTOR defrauded ALFORD and HARRIS with a scheme that was broader than any single misrepresentation, his contention that ALFORD and HARRIS have failed to prove that they reasonably relied on the DEBTOR'S statement of the amount of ACT'S liabilities is not dispositive.[23] A creditor's reliance only comes into play when the fraud complained of takes the form of a misrepresentation. *McClellan*; *In re Green*, 296 B.R. 173 (Bankr.C.D.Ill.2003). The question here is whether ALFORD and HARRIS were in fact tricked by the DEBTOR. "Reliance" is subsumed within that determination. Nevertheless, based on their credible testimony that they would not have advanced the funds had they known the truth about ACT'S liabilities, the Court finds that ALFORD and HARRIS did believe and rely on what the DEBTOR told them, including that the amount of ACT'S debt was $1.2 million, and that the reliance was justifiable. After all, ALFORD and HARRIS were going into business with the DEBTOR and had every reason to trust what their new "partner" was telling them.

The DEBTOR also points to actions taken by ALFORD and HARRIS after learning of ACT'S true financial condition, only days after making the initial payment under the Letter of Intent. Contrary to the DEBTOR'S suggestion that by their actions in going forward with the transaction they were either affirming their investment or somehow acquiescing in the DEBTOR'S misrepresentations, this Court considers that ALFORD and HARRIS were attempting to make the best of a bad situation. They cannot be penalized for attempting to keep ACT afloat long enough to recover their money.

---

**23.** Section 523(a)(2)(A) requires only justifiably reliance, a standard less demanding that "reasonable" reliance required under Section 523(a)(2)(B). *Field v. Mans, supra*; *In re Morris*, 223 F.3d 548 (7th Cir.2000).

## CONCLUSION

█ For the reasons set forth herein, the $60,000 debt is determined to be non-dischargeable under Section 523(a)(2)(A). Judgment will be entered against the DEBTOR and in favor of each of the Plaintiffs in the amount of $30,000. The Plaintiffs request interest. Because the claim was for a fixed sum of money, the Plaintiffs are entitled to prejudgment interest under Illinois law at the rate of 5% per annum. 815 ILCS 205/2; *See, Employers Ins. of Wausau v. Titan Intern., Inc.,* 400 F.3d 486, (7th Cir.2005). Under the "Break Up Fee" section of the Letter of Intent, they forewent interest for six months after the signing. Calculated from December 4, 2001, through March 14, 2005, the interest totals $9,838.36. Post-judgment interest accrues at the rate specified in 28 U.S.C. § 1961. Plaintiffs are also awarded costs of $150 for the adversary filing fee.

█ The Plaintiffs also request attorney fees. The Letter of Intent does not contain a provision for fees, however, and there is no statutory basis for a fee award. Based on the American Rule, the fee request must be denied. *See, Matter of Sheridan,* 105 F.3d 1164 (7th Cir.1997).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

## ORDER

For the reasons stated in an Opinion filed this day, IT IS HEREBY ORDERED as follows:

1. Pursuant to 11 U.S.C. § 523(a)(2)(A), Defendant's debt to the Plaintiffs in the amount of $60,000.00 is determined to be non-dischargeable.

2. Judgment is entered in favor of the Plaintiff, Thomas Alford, and against the Defendant, A. DeWayne Cassel, II, in the amount of $30,000.00, plus prejudgment interest in the amount of $4,919.18, plus court costs in the amount of $75.00.

3. Judgment is entered in favor of the Plaintiff, Lamar Harris, and against the Defendant, A. DeWayne Cassel, II, in the amount of $30,000.00, plus prejudgment interest in the amount of $4,919.18, plus court costs in the amount of $75.00.

4. Plaintiffs' request for an award of attorney fees is DENIED.